**AERO SPACELINES, INC.**

v.

**The UNITED STATES.**

**No. 589–71.**

United States Court of Claims.

Jan. 28, 1976.

---

**3.** Prilled ammonium nitrate is also used sometimes as a component of blasting agents.

Francis C. Brown, Jr., New York City, atty. of record, for plaintiff.

Bruce G. Forrest, Washington, D.C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D.C.., for defendant. Gerald D. Freed, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and DAVIS and KASHIWA, Judges.

## OPINION

PER CURIAM:

 This renegotiation case comes before the court on defendant's exceptions to the recommended decision, filed July 23, 1975, by Trial Judge Joseph V. Colaianni, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. With the qualification to be stated in the next paragraph, the court agrees with the recommended decision, as hereinafter set forth,* and hereby affirms and adopts the same, with minor modifications, as the basis for its judgment in this case.

The court does not understand the trial judge's opinion as holding that use of the weighted guidelines method of determining reasonable profits (or a method patterned on that system) is automatically forbidden in renegotiation. That method is not outlawed *per se* if properly used,** but, as the trial judge points out, it has some inherent dangers in assessing performance after the fact, which must be carefully guarded against. In this instance, defendant's expert witness did not so use the method, and perhaps could not in the circumstances, as to make a convincing presentation that plaintiff's profits were in fact excessive or to show the amount of the excess. The trial judge's opinion underscores the particular defects of the witness's presentation, and we agree

with that criticism. The defendant has not carried the burden it bears, under *Lykes Bros. S.S. Co. v. United States,* 459 F.2d 1393, 198 Ct.Cl. 312 (1972), of showing that plaintiff realized excessive profits and the amount of such excess.

Accordingly, plaintiff is entitled to a refund of the amount paid to defendant, together with interest as provided by the Renegotiation Act of 1951, as amended.

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge:

Plaintiff was a sole-source supplier to the National Aeronautics and Space Administration (NASA) of air transportation of "outsize" cargoes too large to be transported in conventional cargo aircraft. The cargoes which plaintiff transported for NASA consisted of components used in the Apollo Moon Program and included the Douglas Saturn-IV B Third Stage and North American Aviation's Lunar Excursion Module. Plaintiff transported these items from the west coast, where they were assembled, to Kennedy Space Center in Florida. To provide this unique service, plaintiff employed two specially fabricated aircraft known as the "Pregnant Guppy" and the "Super Guppy." Each had a substantially enlarged fuselage to accommodate the outsize NASA freight.

Plaintiff's contract with NASA was subject to the Renegotiation Act of 1951, 65 Stat. 7, *as amended,* 50 U.S.C. App. §§ 1211–33 (1970), *as amended,* (Supp. III, 1973). Dissatisfied with a unilateral determination by the Renegotiation Board that plaintiff realized excessive profits of $250,000 during fiscal year 1966, plaintiff seeks de novo judicial redetermination of the amount of excessive profits, if any, realized by plaintiff in 1966. The action was originally

---

* Although the court adopts the trial judge's separate findings of fact, which are set forth in his recommended decision filed July 23, 1975, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

** *Cf. Newport News Shipbuilding & .Dry Dock Co. v. United States,* 374 F.2d 516, 179 Ct.Cl. 97 (1967); *Bethlehem Steel Corp. v. United States,* 423 F.2d 300, 191 Ct.Cl. 141 (1970); *Bethlehem Steel Corp. v. United States,* 511 F.2d 529, 206 Ct.Cl. 122, (Feb.1975), *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975).

brought in the United States Tax Court and was transferred to the Court of Claims pursuant to the Act of July 1, 1971, Pub.L. No. 92–41, 3(e), 85 Stat. 97, 98 (1971).

■ *Lykes Bros. S.S. Co. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972), established the principle that in de novo redeterminations by this court of the amount of excessive profits, if any, realized by a Government contractor subject to the Act, the burden rests upon the Government both to persuade the court that plaintiff realized excessive profits and to prove the extent of the excessive profits. The plaintiff does not have "the burden of persuasion on the principal issue" because plaintiff is, in effect, seeking declaratory relief from a unilateral assertion of the Renegotiation Board that plaintiff has realized excessive profits in a particular amount. *See id.* at 327, 328, 459 F.2d at 1401, 1402. "It is the Government, based upon a unilateral order of the Renegotiation Board, which asserts that the contractor owes it money." *Id.*, 459 F.2d at 1400, 198 Ct.Cl. at 325.

■ The Court of Claims is the first forum in which a contractor has an opportunity to be heard in a manner consistent with procedural due process and in a proceeding generating a formal, reviewable record. Accordingly, in the Court of Claims proceeding, no presumption of correctness is accorded the Renegotiation Board's order determining excessive profits. The unilateral order is

treated simply as a claim by the Government against the contractor. Furthermore, the court held in the *Lykes* case, *supra*, that a rule assigning the burden of proving the existence and amount of excessive profits to the Government is more consistent with the Congressional requirement of a full de novo redetermination of excessive profits [1] than the former Tax Court practice placing upon the contractor the burden of proving that its profits were reasonable.[2] 459 F.2d at 1399, 1403, 198 Ct.Cl. 323–24, 330. The Government bears this burden in a redetermination proceeding despite the fact that the contractor, as plaintiff, is nominally the moving party. For this reason, the court has found it helpful to analogize a renegotiation suit to the type of declaratory judgment action in which an insurer sues for a declaration relieving it of its contractual obligation to pay insurance benefits on the ground that actions of the insured, such as suicide, have made the policy inapplicable. Although such a suit is instituted by the insurer, which has "the burden of providing the existence of the controversy"[3] and the jurisdiction of the court,[4]

* * * the burden of proving, by a fair preponderance of the evidence, the existence of the fact or facts upon which the rights and liabilities of the parties depend is upon him who has the affirmative of the issue which forms the basis of the controversy, without regard to whether he is plaintiff or defendant in the suit.[5]

---

1. 50 U.S.C. App. § 1218 (1970), *as amended*, (Supp. III, 1973).

2. In *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 23, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974), the first of two recent decisions dealing with the relationship between the Renegotiation Act and the Freedom of Information Act, the Supreme Court made the following reference to renegotiation suits in this court:

"There is no limitation or denial of the contractor's normal litigation rights when the renegotiation process is at end. The contractor may institute its *de novo* proceeding in the Court of Claims, *unfettered by any prejudice from the agency proceeding* and free from any claim that the Board's determination is sup-

ported by substantial evidence. There the usual rights of discovery are available. And there *the parties are not bound by a prior determination made at any level of the Renegotiation Board structure.*" [Emphasis added; footnote omitted.]

3. *Reliance Life Ins. Co. v. Burgess*, 112 F.2d 234, 240 (8th Cir.) (concurring opinion), *cert. denied*, 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453 (1940), cited with approval in *Lykes Bros. S.S. Co. v. United States*, 459 F.2d 1393, 1402, 198 Ct.Cl. 312, 328–29 (1972).

4. E. Borchard, Declaratory Judgments 407 (2d ed. 1941).

5. *Reliance Life Insurance Co. v. Burgess*, *supra*, 112 F.2d at 241.

In an insurance declaratory judgment action, the party held to have "the affirmative of the issue which forms the basis of the controversy" is the representative of the insured, who must prove that the claim for recovery under the insurance policy is a valid one. In a renegotiation suit, the underlying claim is the Government's assertion that the contractor realized a particular quantity of excessive profits. In both types of cases, the party asserting the fundamental claim has the burden of proof. The analogy between the insurance declaratory judgment and de novo redetermination of excessive profits in this court is central to the court's opinion in *Lykes.* 459 F.2d at 1402, 198 Ct.Cl. at 328–29.

■ By assigning the burden of persuasion to the Government, the court also held that the Government, although the defendant, must bear the risk of nonpersuasion if the evidence in the case should be in equipoise. In an action patterned on the insurance declaratory judgment model, " * * * the burden of proof is on the party who would receive an adverse judgment if no evidence were submitted." Annot., 23 A.L.R.2d 1243, 1253 (1952), citing *Reliance Life Ins. Co. v. Burgess,* 112 F.2d 234 (8th Cir.), *cert. denied,* 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453 (1940), *Bauer v. Clark,* 161 F.2d 397 (7th Cir.), *cert. denied,* 332 U.S. 839, 68 S.Ct. 210, 92 L.Ed. 411 (1947), and *Pacific Portland Cement Co. v. Food Mach. & Chem. Corp.,* 178 F.2d 541 (9th Cir. 1949).

■ Although the Government bears the risk of nonpersuasion, a risk which, once it is assigned, does not shift during the course of litigation, the court held, in the exercise of its discretion over the manner in which its proceedings are to be held, that—

* * * the contractor has the initial burden of going forward with proof as to the statutory factors upon which it relies to the extent that the facts pertaining thereto are within its knowledge or possession, are accessible to the public generally in the form of published reports, or are *actually made available to the contractor* by the Government, * * *. Normally, when the contractor does this, it will have made a prima facie case, i.e., a showing which, unless rebutted, would justify a judgment in accord with the contractor's contentions.[6]

The rule adopted by the court is analogous to a Renegotiation Board Regulation, 32 C.F.R. § 1460.1, "General Considerations," which provides:

(b) The contractor will be given an opportunity to develop and present whatever information is available to it *which the contractor may consider pertinent to the determination.* [Emphasis added.]

During the Board proceedings, the contractor is given an opportunity to present information which it feels places its contribution in the most favorable light, before the Board reaches its conclusion concerning the contractor's profitability. *See Renegotiation Board v. Grumman Aircraft,* 421 U.S. 168, 173–74, 175, 176–77, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975).

Similarly, by holding that the contractor may discharge its burden of going forward by presenting evidence as to the statutory factors *upon which it relies,* the court has defined the contractor's task as making the best case it can to blunt the impact of the defendant's anticipated case in chief. Plaintiff's obligation to proceed first is not an empty formality. Though defendant bears the risk of nonpersuasion regardless of the cogency of plaintiff's opening presentation, plaintiff's opening case will inevitably influence the outcome of the litigation by determining how easily defendant can meet its burden of persuading the court that plaintiff realized excessive profits in a particular amount. If its opening presentation is cogent and thorough, plaintiff runs less risk that the Government will be able to overcome that presentation in seeking to meet its

---

6. *Lykes Bros. S.S. Co. v. United States, supra,* 459 F.2d at 1401, 198 Ct.Cl. at 326–27.

burden of persuasion. On the other hand, if plaintiff's initial presentation is perfunctory, defendant's chance of success is much greater. Obviously, plaintiff's rebuttal case would be strictly confined to meeting defendant's affirmative arguments.

In his dissenting opinion in *Bannercraft Clothing Co. v. Renegotiation Board*, 151 U.S.App.D.C. 174, 466 F.2d 345 (1972), *rev'd.*, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974), Judge MacKinnon discussed the importance of the new ground rules adopted by this court in the *Lykes* decision for protecting the rights of Government contractors undergoing renegotiation:

> The Court of Claims replaced the United States Tax Court as the forum for review of "final determinations" of the Renegotiation Board on July 1, 1971. One of the reasons given in the legislative history for this transfer of jurisdiction was that the Court of Claims is procedurally more suitable for handling renegotiation cases than the Tax Court. H.R.Rep.No.92–235, 92d Cong., 1st Sess. 6 (1971). *Lykes* is the first renegotiation case to have been decided in the Court of Claims since the transfer, and the congressional prophecy seems about to be fulfilled. In *Lykes* * * * the burden of proof concerning the existence and extent of excess profits was shifted to the Government. Perhaps more significantly in the context of our cases here, the burden of going forward with evidence with regard to the statutory factors on which the contractor relies in his argument against an excess profit finding remains with the contractor, but only
>
>> to the extent that the facts pertaining thereto are within its knowledge or possession, are accessible to the public generally in the form of published reports, or are *actually made available to the contractor* by the Government, voluntarily through a request made in pre-trial proceedings, by discovery under the rules of the court, or pursuant to the Freedom of Information Act, 5 U.S.C. § 552.
>
> *Id.* at 367.

■ For reasons discussed *infra*, plaintiff, Aero Spacelines, Inc., had made a prima facie showing that it did not realize excessive profits in 1966. The Government has failed to demonstrate by a preponderance of the evidence either that plaintiff's profits during 1966 were excessive or the amount of the alleged excess.

### Stipulated Cost Figures will be Used

As a preliminary matter, plaintiff contends that costs not reflected on the books and records of Aero Spacelines, Inc., or in the accounting statement to which the parties stipulated before trial should be recognized by this court in order properly to state the costs incurred by plaintiff in connection with its renegotiable business. Specifically, plaintiff asks for:

1. An adjustment of $95,244 in "unreflected depreciation" to compensate plaintiff for the fact that no depreciation was taken on the "Super Guppy," one of the aircraft employed by plaintiff, during the first 2 months of 1966 while the Super Guppy was still undergoing flight tests;

2. A credit for an undetermined "reserve for self-insurance" to compensate plaintiff "to the extent that plaintiff either elected or was compelled to act as a self-insurer with respect to certain risks"; and

3. A $950,000 cost allowance to reflect amortization of the excess of the purchase price Aero Spacelines, Inc., paid for its assets over the value of those assets on the books of Havenhurst Van Nuys, Inc., the corporation which was plaintiff's predecessor.

For reasons which follow, each of these cost adjustments proposed by plaintiff is rejected. The sales, cost, and profit figures to be assayed for excessiveness are those to which the parties stipulated before trial.

The parties stipulated that plaintiff had $3,926,239 in renegotiable sales; $2,793,299 in costs attributable to those sales; and $1,132,940, the difference between sales and costs, in renegotiable profits. Plaintiff now argues that additional costs, neither reflected upon plaintiff's books nor included in the accounting statement to which the parties stipulated, should nevertheless be taken into account. Plaintiff seeks thereby to reduce the $1,132,940 profit figure to which the parties have agreed.

The stipulation of facts incorporates by reference, with two exceptions not material here, the statement on accounting for renegotiation submitted as plaintiff's first exhibit.[7] The stipulation has the effect of adopting the accounting figures of the statement on accounting for renegotiation which put plaintiff's renegotiable sales, costs, and profit at $3,926,239, $2,793,299 and $1,132,940, respectively. By express terms of the stipulation, these figures were not to be subject to contradiction by additional, conflicting facts. By asking the court to recognize additional costs, which would correspondingly reduce plaintiff's profits, plaintiff proposes to do precisely what the terms of the stipulation prohibit.

■ Although the court will occasionally relieve a party of its stipulation "if necessary to prevent an injustice, particularly where facts contrary to the stipulation are established by the evidence," *H. B. Zachry Co. v. United States*, 344 F.2d 352, 357, 170 Ct.Cl. 115, 123 (1965), the general rule is that absent special considerations, parties are bound by their stipulation on issues of fact. *Gresham & Co. v. United States*, 470 F.2d 542, 551, 200 Ct.Cl. 97, 112–13 (1972); *John McShain, Inc. v. United States*, 375 F.2d 829, 831, 179 Ct.Cl. 632, 635 (1967).

Analysis of the substance of plaintiff's three proposed additions to cost indicates this is not an appropriate occasion for deviating from this rule.

■ Plaintiff's first cost adjustment proposal is that $95,244 be added to compensate plaintiff for its failure to take depreciation on the Super Guppy during the first 2 months of 1966. Depreciation of plaintiff's aircraft was allowable as a cost of plaintiff's performance of air transportation services for NASA. During 1966, plaintiff was permitted for tax purposes to use a 5-year depreciable life for the Super Guppy and a 200 percent declining balance method of depreciation. Given a book basis of $1,714,395 for the Super Guppy and the method of amortization just described, plaintiff would have been entitled to take $685,758, or 40 percent of the book value of the Super Guppy as tax depreciation during calendar year 1966. However, since the Super Guppy was still undergoing tests in January and February 1966 and had not begun transporting NASA cargoes under plaintiff's contract with NASA, plaintiff did not begin depreciating the aircraft until the beginning of March. The actual depreciation taken during the 10 months of 1966 when the Super Guppy was used for actual air transportation was $571,465. This is $10/12$ of the first-year amortization of the Super Guppy. Plaintiff seeks now both to overturn the stipulation between the parties, which specified $571,465 as the amount of depreciation actually taken on the Super Guppy, and the accounting procedure which plaintiff in fact used in 1966. This it may not do.[8]

Plaintiff argues that the court has discretion, which it should exercise here, to allow an additional $95,244 in Super Guppy depreciation for the first 2

---

7. A third item, purporting to resolve a difference between the parties by stipulating a 5-year depreciation period for plaintiff's Super Guppy aircraft, was superfluous, having already been taken into account in plaintiff's accounting submission.

8. If plaintiff's contention that it should be allowed to make a retroactive adjustment for depreciation not taken during the first 2 months of 1966 were sustained, the correct amount of the adjustment would not be $95,244 or $2/12$ of $571,465, as contended by plaintiff, but rather $114,293, which is $2/12$ of $685,758, the full annual depreciation amount computed by the double declining balance method.

months of 1966. To support its position, plaintiff invokes section 103(f) of the Renegotiation Act of 1951, 50 U.S.C. App. § 1213(f) (1970), *as amended*, (Supp. III, 1973). That part of the renegotiation statute provides that "All items estimated to be allowed as deductions and exclusions under chapter 1 of the Internal Revenue Code" shall be allowed as items of cost for renegotiation purposes. Section 1213(f) also confers upon this court discretion to redefine costs, but only in situations in which a contractor either has not employed a regular method of accounting or has employed a method which does not properly reflect the contractor's cost of doing renegotiable business.

Plaintiff employed an established cost accounting method for 1966. Accordingly, in order to persuade the court to use its statutory authority to modify plaintiff's chosen method of accounting, plaintiff must demonstrate that the method actually used does not properly reflect plaintiff's costs.[9]

This is not such a situation. Plaintiff has shown no facts of record to suggest that use of the standard accounting principle that property is depreciated over its useful life would cause plaintiff's costs to be misstated. Plaintiff did not depreciate the Super Guppy in January or February of 1966 because the aircraft was still undergoing tests. The Super Guppy did not actually begin carrying NASA cargoes until March 1966.

A principle advantage of consistent adherence to Internal Revenue Code accounting methods, mandated by Congress in 50 U.S.C. App. § 1213(f) (1970), *as amended*, (Supp. III, 1973), is the uniformity which those methods provide over several years of renegotiable business. Defendant correctly observes that the depreciation which plaintiff now seeks to take was undoubtedly reflected

in plaintiff's tax returns and renegotiation reports for subsequent years.[10] In order to prevent a "double deduction" of the additional $95,244 depreciation allowance now sought by plaintiff, revision of all of plaintiff's subsequent tax and renegotiation submissions would be necessary. Plaintiff has not shown the manifest unsuitability of the accounting method it has used which might warrant revision of that method, with all of the attendant complications.

Plaintiff's second proposed cost adjustment is for a "reserve for self-insurance," unspecified in amount and not reflected in plaintiff's accounting statement to which the parties have agreed. Plaintiff carried hull, liability, and excess liability insurance on its aircraft during 1966 and loss of use insurance for the first 6 months of 1966. Plaintiff argues that it should receive an indeterminate amount of cost credit for the extent to which it acted as a self-insurer with respect to losses not covered by insurance and for which it had no recourse to NASA. Plaintiff set aside no reserve for self-insurance against possible loss of use or any other contingency in 1966, and no such reserve appears in plaintiff's accounting statement. Accordingly, there is no basis in fact for this court to make the cost adjustment which plaintiff seeks.

The third cost adjustment sought by plaintiff is a $950,000 cost allowance to reflect amortization of the excess of the purchase price which was paid for the assets of Havenhurst Van Nuys, Inc. To place plaintiff's argument in context, it is necessary to know something of plaintiff's organizational history.

Plaintiff, Aero Spacelines, Inc., was organized in 1965 as a wholly-owned subsidiary of Twin Fair, a New York corpo-

9. *See Bay Co. v. Renegotiation Board*, 38 T.C. 535, 546–48 (1962), in which a contractor's evidence that other accounting methods would have been more accurate was not considered by the Tax Court where the method actually employed did accurately reflect costs. *See*

*also* 32 C.F.R. § 1459.1(b)(2) (1974) (Renegotiation Board regulation).

10. In fact, the record shows that plaintiff did depreciate the Super Guppy fully, down to a token salvage value of $50,000.

ration, to acquire the assets and assume the liabilities of Havenhurst Van Nuys, Inc., a California corporation known also as Aero Spacelines, Inc.

Prior to being acquired, Havenhurst had designed and fabricated at its sole expense and risk a special purpose aircraft for transporting outsize cargo by air. This aircraft, known as the Pregnant Guppy, was a structurally modified Boeing 377 Stratocruiser. Havenhurst conceived and developed the Pregnant Guppy and proved its capability to transport oversize cargoes. From its completion in mid-1963, the Pregnant Guppy was continuously under exclusive contract to NASA.

In January 1965, Havenhurst began modifying a Boeing YC–97J aircraft to transport cargoes that were too large even for the Pregnant Guppy. These cargoes included the Saturn-IV B stage and the Lunar Excursion Module. This second structurally modified Boeing aircraft was designated the Super Guppy. The Super Guppy was not simply an extension of the technology of the Pregnant Guppy, which had been built by enlarging the fuselage of the Boeing 377 Stratocruiser. Manufacture of the second Guppy aircraft required numerous, complex modifications of the YC–97J. These modifications were considerably more elaborate than those which were necessary in manufacturing the Pregnant Guppy.

By mid-1965, Havenhurst found itself financially unable to complete construction of the Super Guppy. Havenhurst was insolvent, had exhausted its credit, and was seeking a purchaser willing to provide the financing necessary to complete construction of the Super Guppy. The management of Twin Fair was approached by a business broker who suggested that Twin Fair acquire the assets of Havenhurst.

On August 12, 1965, before completion of the Super Guppy and prior to the beginning of the fiscal year under consideration, Havenhurst transferred all of its assets (including its NASA contract) and liabilities to plaintiff, Aero Space-lines, Inc., in exchange for voting common stock of Twin Fair, plaintiff's parent corporation. The parties have stipulated that the purchase price exceeded the value of the net assets on the books of the acquired corporation by at least $2,185,340. No portion of this excess was amortized or otherwise charged against the contractor's sales in determining profits subject to renegotiation. There is no evidence that the acquisition price negotiated was not arrived at by arm's-length dealings between the acquired and acquiring corporations.

The acquisition qualified under Section 368(a)(1)(C) of the Internal Revenue Code of 1954 as a tax-free reorganization. The principal tax consequences of treating the acquisition as a tax-free reorganization were two-fold:

1. Havenhurst was not required to recognize capital gains upon the transaction (Int.Rev.Code of 1954, § 361(a)); and

2. The basis of the property transferred to Aero Spacelines, Inc., remained the same as it had been in the hands of the transferor (Int.Rev.Code of 1954, § 362(b)).

Consistent with Section 362(b) of the Code, the Havenhurst assets were taken on the tax books of the new corporation, Aero Spacelines, Inc., at their depreciated value on the tax books of Havenhurst. The market value of the Twin Fair stock issued in exchange for the assets was not shown on the Aero Spacelines' books. Accordingly, none of the difference between the market value of the Twin Fair stock and the depreciated tax value of the Havenhurst assets was amortized against the contractor's sales in determining profit subject to renegotiation.

In seeking to amortize the stipulated excess of the purchase price over the tax book value of Havenhurst assets acquired by Aero Spacelines, Inc., plaintiff now attempts to modify the accounting method which it actually used in 1966 for federal income tax purposes. To do this, plaintiff must demonstrate that the

method used for federal income tax purposes is manifestly unsuitable for renegotiation purposes because it does not clearly reflect the profits attributable to plaintiff's performance of its renegotiable contract in 1966. The plaintiff must show, further, that the alternative it proposes does clearly reflect such costs. This plaintiff has not done.

Plaintiff argues that under presently accepted accounting principles applicable to its nontax bookkeeping, the stipulated $2,185,340 difference between the market value of Twin Fair stock issued to acquire the Havenhurst assets and the book value of the acquired assets would be reflected on the books and records of the plaintiff and amortized against earnings. This would result in a charge against earnings in 1966 in an amount in excess of $900,000.[11]

This $2,185,340 component of the purchase price, plaintiff asserts, was a true economic cost of the acquisition and, accordingly, should be recognized by this court in evaluating plaintiff's costs.

At trial, plaintiff introduced evidence that under presently accepted accounting principles the August 1965 acquisition would be required to be accounted for by the "purchase method." In this form of combination—

* * * [t]he agreed terms * * * recognize primarily the fair values and only secondarily the historical-cost based amounts of assets and liabilities as reflected in the financial statements of the acquired company. Accordingly, the purchase method requires recognition of the fair values through allocation of the cost or purchase price of an acquired company to the assets acquired and liabilities assumed. Identifiable assets and liabilities of an acquired company, whether or not shown in the financial statements of that company, are assigned a portion of the purchase price, normally equal to their fair values at date of acquisition. Any excess of the purchase price

over the sum of the amounts assigned to identifiable assets acquired less liabilities assumed is recorded as goodwill. Goodwill is required to be amortized by systematic charges to income over the period estimated to be benefited.

Despite its superficial appeal, plaintiff's argument fails for two reasons. First, the "purchase method" of accounting was not actually used in 1965 by the parties to the acquisition. They elected instead, in accordance with then generally accepted accounting principles, to treat the transaction as a "pooling of interests." Paragraph 12 of Opinion No. 16 of the Accounting Principles Board (August 1970), which applies primarily to nontax accounting procedures, explains that in a pooling of interests—

* * * [o]wnership interests continue and the former bases of accounting are retained. The recorded assets and liabilities of the constituents are carried forward to the combined corporation at their recorded amounts.

In 1966, this method was used for most business combinations in which stock was issued. It was the method actually used by plaintiff, was reflected in plaintiff's 1966 nontax books, and closely paralleled the tax accounting method mandated by Sections 361 and 362 of the Internal Revenue Code for a tax free reorganization.

Plaintiff's accounting witness testified that if the transaction had taken place in 1974 rather than in 1965, the preferred accounting approach would be the purchase method rather than the pooling of interests method. However, the witness noted specifically that by its express terms, Accounting Principles Board Opinion No. 16 was not to be applied retroactively to business combinations initiated before November 1, 1970, the effective date of the opinion. The witness testified, further, that it was neither his opinion nor the opinion of Price Waterhouse, the accounting firm which

---

11. At trial, plaintiff's president, Mr. Vaughan Read, placed the 1966 amortized portion of this excess at $950,000.

he represented, that the change in method should be applied retroactively in this case.

Secondly, retroactive application of the purchase method presents difficult problems of valuation which plaintiff has not addressed with proof. Plaintiff has not assigned fair values to the "identifiable assets" acquired from its predecessor. No portion of the purchase price has been assigned to a 5-year covenant of the officers of plaintiff's predecessor not to compete with Aero Spacelines in the outsize cargo air transportation business. No fair value has been assigned to the NASA contract to which the new corporation was to succeed. Since plaintiff has made no attempt to assign portions of the purchase price to the identifiable assets received from Havenhurst, it is not possible to place a value on the residual, the goodwill acquired from Havenhurst. Plaintiff has neither estimated the period to be benefited by Havenhurst's goodwill[12] nor addressed the troublesome question of why, even if annual goodwill amortization could be measured, the Government should subsidize plaintiff's acquisition of a concern with potential commercial viability well after expiration of the exclusive NASA contract under which plaintiff initially operated. Because plaintiff has not allocated specific portions of the $950,000 annual amortization cost claimed to increases in the values of physical assets over book values, to plaintiff's intangible assets (the covenant not to compete and the NASA contract), or to goodwill, plaintiff has failed to make the clear factual presentation necessary to warrant replacing the method of accounting plaintiff actually used in 1966 and to which the parties have stipulated.

### I. Plaintiff's Prima Facie Case

Lykes Bros. S.S. Co. v. United States charges the contractor with the initial burden of going forward with proof as to the statutory factors upon which it relies in order to make a prima facie case that it has not realized excessive profits in the year under review. 459 F.2d at 1401, 198 Ct.Cl. at 326–27. Once the contractor has done this, "the burden shifts to the Government to prove that plaintiff's profits were excessive and the extent thereof." Id. 459 F.2d at 1402, 198 Ct.Cl. at 327. The Government has the burden of persuasion on each of these issues. Id.

In § 103(e) of the Renegotiation Act of 1951, 50 U.S.C. App. § 1213(e) (1970), Congress set forth the following, general criteria for identifying "excessive profits":

The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title [sections 1211 to 1224 of this Appendix] to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

---

**12.** The principal obstacle to the allowance of charges against income for amortization of goodwill is the difficulty of establishing a useful life. See Thrifticheck Serv. Corp. v. Commissioner, 287 F.2d 1, 4–5 (2d Cir. 1961), in which the price paid by a purchaser of a business for intangibles was held nondepreciable for lack of any reasonable estimate of useful life. See also Golden State Towel & Linen Serv., Ltd. v. United States, 373 F.2d 938, 941, 179 Ct.Cl. 300, 305 (1967); Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 1230–31, 186 Ct.Cl. 1, 30 (1968); KFOX, Inc. v. United States, 510 F.2d 1365, 1377–78, 206 Ct.Cl. 143, 165–68 (1975).

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

As the Supreme Court noted in *Lichter v. United States*, 334 U.S. 742, 784–85, 68 S.Ct. 1294, 1316, 92 L.Ed. 1694 (1948), Congress did not choose to provide the Renegotiation Board or the courts—

* * * with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program.

Congress' eschewal of formulae or precise percentage limitations on profits was deliberate, renegotiation having been conceived as a flexible means of eliminating excessive profits without interference with war production.[13] The need for case-by-case application of the statutory factors was made necessary by

the difficulty of developing broad rules which could be applied fairly to all types of firms doing business with the Government,[14] and determinations of excessiveness made on the basis of individual cases were designed to eliminate problems presented by use of a fixed-profit formula.[15] 32 C.F.R. § 1460.8(a) (1974) provides:

Reasonable profits will be determined in every case by over-all evaluation of the particular factors present and not by the application of any fixed formula with respect to rate of profit, or otherwise.

This Renegotiation Board regulation underscores the importance of comprehensive evaluation, in terms of all of the statutory factors, of a renegotiated contractor's performance in the fiscal year under review.

"Comprehensive evaluation" is not synonymous with purely subjective determination. As the Tax Court observed in *LTV Aerospace Corp. v. Renegotiation Board*, 51 T.C. 369, 397 (1968), one of the last cases in which that court addressed the specific issue of excessive profits,—

The decision as to the existence and amount of excessive profits is to be reached on the basis of objective business judgment [citing H. Rep. No. 7, 82d Cong. 1st Sess. 2 (1951)], and the Act provides a number of criteria to be considered in making that judgment.

Although the criteria are necessarily general and though the different statutory factors necessarily have different weight and relevancy in different situations,—

* * * The parties to a renegotiation proceeding must present to this

---

**13.** *See* R. C. Osborn, Renegotiation of War Profits 82 (University of Illinois Bureau of Economics and Business Research Bulletin No. 67, 1948).

**14.** Weston & Jacoby, *Profit Standards*, 66 Q.J. Econ. 224, 227–28, 248–49 (1952).

**15.** Three major objections to flat profit limitations by Congress were that such limitations provided no incentive to reduction of costs, failed to reward efficiency, and failed to

achieve true uniformity by rewarding Government contractors in accordance with the complexity of their performance, magnitude of their risk and extent of their contribution to the defense effort. Statement of Robert C. Patterson, Under Secretary of War, *Hearings on Sec. 403 of Public Law Numbered 528 Before a Subcomm. of the Senate Comm. on Finance*, 77th Cong., 2d Sess. 5, 7, 10–11 (1942).

Court the facts relevant to the contractor's performance. They must also present sufficient information as to the relevant industry norms to enable this Court to determine the appropriate standards against which the contractor's performance under each criterion is to be evaluated. Finally, they must provide us with sufficient information that we may determine what weight the contractor's comparative performance under each criterion is to be given, in the particular case, in reaching our ultimate decision. [*Id.*]

Though the *Lykes* decision shifted the burden of persuasion on the issue of excessiveness from the contractor, upon whom it had rested in proceedings before the Tax Court, to the Government, *Lykes* did not dispense with the requirement that the court have enough information before it to render a just decision. The court must be in the position to make a decision based upon reasoning cogent enough—

* * * to warrant the conclusion that any reasonable and fairminded man, exercising an informed business judgment, would be likely to reach approximately the same result.[16]

■ Insistence by the Tax Court in *LTV Aerospace Corp. v. Renegotiation Board, supra,* on meaningful comparative data is echoed by 32 C.F.R. § 1460.2(c) (1974), which provides:

*Comparisons.* In evaluating the contractor's performance, comparisons will be made with the prices, costs and profits of other contractors engaged in the production of the same or similar products or using the same or similar processes.

Comparative analysis is essential in order to give the statutory factors concrete, dollars and cents meaning.

In the words of one commentator on renegotiation:

The term [excessive profits] itself implies comparisons to profits earned on current and previous private contracts by both the contractor and its competitors and profit earnings averages for the relevant industry.[17]

A most important question in renegotiation is " * * * where the contractor in a defense industry belongs in the hierarchy of profit returns of industry as a whole and the reason for his being placed in that particular position." [18]

Despite the importance of meaningful comparative data, neither party to this suit has made a significant effort to bring such information before the court. The absence of helpful comparisons characterized both plaintiff's prima facie case and the Government's response. The defendant, which bears the ultimate burden of proving both the existence of excessive profits *and the extent of those*

16. GAO, Report to Congress: Operations and Activities of the Renegotiation Board 33 (GAO Report B–163520, 1973), *quoting* Renegotiation Board Operational Bulletin 60–14. This objective, first articulated in the Renegotiation Board operating bulletin, is an appropriate one to insist upon here. A similar goal was articulated in H. Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards 14 (1962):

"[W]here the initial standard is thus general, it is imperative that steps be taken over the years to define and clarify it—to canalize the broad stream into a number of narrower ones. I do not suggest this process can be so carried out that all cases can be determined by computers; I do suggest it ought to be carried to the point of affording a fair degree of predictability of decision in the great majority of cases and of intelligibility in all."

17. Note, *Reform of the Renegotiation Process in Government Contracting,* 39 Geo.Wash.L. Rev. 1141, 1162 (1971). This view is echoed in both governmental and scholarly discussion of the renegotiation process. *See, e.g.,* Staff of Joint Comm. on Internal Revenue Taxation, 93D Cong., 2d Sess., Staff Review of Recommendations made on the Renegotiation Process: A Preliminary Report 28 (1974); Weston & Jacoby, *supra* note 14; Burns, *The Tax Court and Profit Renegotiation,* 13 J.L.&Econ. 307, 312 (1970); Marcus, *The Need for Standards in Renegotiation and Other Determinations of Defense Profits,* 32 Geo.Wash.L.Rev. 23 (1963).

18. Marcus, *supra* note 17, at 47.

*profits* necessarily fares worse than does plaintiff for lack of this information.

### Character of Business

The fifth, enumerated statutory factor, "character of business," is discussed first in order to provide a framework for discussion of all of the statutory factors. The language of Section 103(e)(5), 50 U.S.C. App. § 1213(e)(5) (1970), is as follows:

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

During fiscal year 1966, plaintiff provided oversize air transportation services for the National Aeronautics and Space Administration pursuant to renegotiable contract NAS 8–15476. In addition, plaintiff performed instrument calibration and maintenance and engine overhaul and modification projects related to the basic transportation service contract. Plaintiff's renegotiable sales of $3,926,-239 accounted for all but less than one-tenth of one percent of plaintiff's total business in 1966. Plaintiff's nonrenegotiable sales consisted of a single $3,300 sale of surplus equipment. Plaintiff's nonrenegotiable sales are of no significance for renegotiation purposes because they constituted such a minimal fraction of plaintiff's total business.

As noted earlier in this opinion, plaintiff used two specially built aircraft to carry cargoes for NASA which were simply too large for conventional cargo aircraft to accommodate. The first of these aircraft, the Pregnant Guppy, had been developed by Havenhurst, plaintiff's predecessor corporation, and had been continuously under exclusive contract to NASA since its completion in mid-1963. The second, larger and more complex aircraft, the Super Guppy, was begun by Havenhurst but was completed and flight tested by plaintiff after plaintiff purchased its insolvent predecessor in order to continue its operations.

Both of the Guppies—but particularly the Super Guppy, which plaintiff completed and tested—were extraordinary looking aircraft whose unconventional profiles appeared almost to defy the laws of aerodynamics. The Pregnant Guppy had been fabricated by enlarging the fuselage of a Boeing 377 Stratocruiser to 19 feet 9 inches in diameter by building a new shell around the old fuselage. No further structural changes were required in order to maintain the aerodynamic stability of the aircraft. Manufacture of the Super Guppy, however, was considerably more complex.

The Super Guppy was designed principally as a mode of transportation for Douglas S-IVB stages, which were used as the third stage of the NASA Saturn-V launch vehicle employed in the Apollo moon program. The Super Guppy began with a Boeing YC-97J, a military cargo aircraft which had the additional power needed to carry the heavier cargoes envisioned for the Super Guppy. Only two YC-97J's had ever been manufactured, and one of these had already been scrapped by the Air Force. To accommodate the S-IVB stage, the fuselage of the Super Guppy had to be expanded to between 23 and 24 feet in diameter. This change in fuselage dimensions so altered the aerodynamic characteristics of the Super Guppy from those of the YC-97J that significant modifications to the wing and tail structures were also required. The YC-97J was, in effect, completely dismantled and reassembled into an entirely new aircraft.

Aero Spacelines also made significant structural changes related to the cargo loading capability of the Super Guppy. The Super Guppy was the first aircraft ever to be built with a nose opening for loading cargo. The flight control system of the aircraft also had to be redesigned so that the nose could be hinged open. The control system's modification was a major one and the first of its kind.

The United States Government provided none of the capital for development of the Super Guppy airframe, and Havenhurst was the only business known to NASA which was willing to design and

build such an aircraft at its own risk and expense. After Aero Spacelines "bailed out" the insolvent Havenhurst, the new corporation obtained a $950,000 loan from a New York bank, guaranteed by the parent company, in order to complete construction of the Super Guppy.

Contract NAS 8–15476 was not a manufacturing contract nor a contract for purchase of aircraft, but was a service contract providing transportation of oversize cargo. NAS 8–15476 was unique among service contracts in that the Guppies were both designed for the purpose of facilitating the NASA space program and with particular NASA cargoes in mind. This was especially true of the Super Guppy, whose internal dimensions were determined in large measure by the dimensions of the S-IVB stage, a specific item of NASA freight. Furthermore, contract NAS 8–15476 specified that NASA should have exclusive use of the services of the Guppies for the duration of the contract, including renewal periods, and NASA insisted vigorously upon keeping the aircraft under its control.

The unusual character of plaintiff's business, and plaintiff's willingness to design and build a special purpose aircraft at its own risk and expense, are important factors in establishing plaintiff's prima facie case.

The statutory subfactor, complexity of manufacturing technique, is not applicable because plaintiff provided a service. The difficulties inherent in plaintiff's operations are considered under the statutory factors, "risk" and "contribution to the defense effort."

Source and nature of materials is a second subfactor to be considered under the statutory factor, "character of business." Pursuant to two Air Force contracts, the Air Force leased to plaintiff spare aircraft parts, aircraft engines, and propellers for use in operating the Super Guppy. These Government surplus items had a total "stated value" of $1,424,476. Defendant's witness testified that "stated value" is undepreciated original cost to the United States, it being the practice of the Government not to depreciate its equipment but to write off the cost only when the equipment is scrapped. No evidence appears in the record to establish what it would have cost plaintiff to purchase these materials had plaintiff been required to purchase them. By the terms of the Air Force contracts, plaintiff was obligated to maintain the equipment at its own expense and to return it to the United States Air Force in the same condition as received, less normal wear and tear. Plaintiff paid no fee for the use of these surplus items.

32 C.F.R. § 1460.14(b)(2) (1974) provides:

A contractor who uses customer-furnished materials *generally* is not entitled to as large a dollar profit as the dollar profit to which such contractor would have been entitled had it furnished the materials itself. In the latter case, the contractor would have expended effort in finding or acquiring the materials, would have invested capital in the materials and would have assumed the risks of obsolescence, spoilage, or other loss inherent in owning such materials. [Emphasis added.]

Despite the presumption that, all other things being equal, a contractor who uses Government-furnished materials is entitled to less profit than one who does not, the preponderence of evidence before the court does not warrant reducing plaintiff's profit because it used Government surplus equipment.

The Renegotiation Performance Report by NASA to assess plaintiff's performance during 1966 indicates that plaintiff "was Economical in Use of Materials, Facilities, and Manpower, and was otherwise effective in Controlling Production Costs." Assuming this assessment by the contracting agency to be correct, plaintiff's use of Government surplus engines, propellers, and spare parts is one source of plaintiff's cost effectiveness. The record suggests that

cost savings were, in fact, passed on to the Government as a result of plaintiff's having used Government-furnished parts. Defendant introduced no evidence to support a contrary inference.

Plaintiff introduced additional evidence indicating that its use of military surplus equipment, while saving the initial cost of new engines and propellers, made spare parts difficult to locate and maintenance costs difficult to predict. Regulation 1460.14(b)(2) in effect provides that a contractor which uses materials it owns itself is entitled to compensation for its investment and for its assumption of the risks of ownership. Although it was not the owner of the parts provided by the Government, plaintiff was obligated by contract to maintain the leased property in good condition and remained "solely and fully liable for any damage to, or loss or destruction of, the leased property resulting from any cause whatsoever." Plaintiff was actually in a less favorable position than if it had purchased the parts itself because it bore the risk of loss without benefit of other incidents of ownership. For example, had plaintiff owned the parts, it would have been entitled to earn profit on the value of its investment in the parts, to charge depreciation against current income, and to retain the parts after termination of the NASA contract.

During 1966, plaintiff purchased a significant amount of the fuel and oil it required at Government facilities at prices lower than those prevailing at commercial airfields. There is no evidence in the record to suggest that plaintiff's profit should be reduced because of this contractual privilege. In fact, the fuel cost estimate which Aero Spacelines provided to NASA contract negotiators assumed that 80 percent of plaintiff's fuel purchases would be made at Government installations. This representation was presumably taken into account in negotiations between plaintiff and the Government.

Plaintiff employed no subcontractors. 32 C.F.R. § 1460.14(b)(3)(i) (1974) states the general rule that " * * * a contractor who subcontracts work may not reasonably expect to be allowed as large a profit thereon as if it had done the work itself, * * *." Plaintiff benefits in establishing its prima facie case from the fact that it employed its own facilities and skill in performing under contract NAS 8–15476.

The final statutory subfactor under "character of business" is rate of turnover. Rates of turnover viewed as significant in defense contract analysis and in renegotiation are (1) the turnover of a contractor's equity capital investment,[19] (2) the turnover of total capital investment of the contractor,[20] and (3) "inventory turnover," the ratio of sales to average inventory on hand.[21] Each of these ratios may be relevant in a particular context, depending upon the nature of the business being evaluated and upon comparisons with businesses having similar characteristics.

Because plaintiff provided a service rather than manufactured a product, rate of turnover in the sense of "inventory turnover" is irrelevant in evaluating plaintiff's performance.

19. *See, e.g.,* GAO, Report to Congress: Defense Industry Profit Study 13 (GAO Report B–159896, 1971) (reprinted as Appendix IV to *Hearings on Defense Industry Profit Study of the General Accounting Office Before the Legislation and Military Operations Subcomm. of the House Comm. on Government Operations,* 92d Cong., 1st Sess. (1971)). The GAO report defines turnover of equity capital investment as sales divided by the total dollar value of "capital shares, retained earnings, retained-earning reserves, minority interests, and such other equity-type items as deferred-investment tax credits." *Id.*

20. *See, e.g., id.* The GAO report defines turnover of total capital investment as sales divided by total capital investment, which is defined as "total investment in all assets used in the business, exclusive of any Government-owned or leased items. In other words, the total capital provided by creditors (debt capital) and the owners of the business (equity capital)." *Id.* at 13, 12.

21. Turnover in the third sense was used by the Tax Court in *LTV Aerospace Corp. v. Renegotiation Board,* 51 T.C. 369, 399 (1968).

Renegotiation Board Regulation 1460.-14(b)(4) suggests that turnover ratios may be useful in evaluating whether plaintiff made efficient use of the resources at its disposal, provided that relevant comparisons are made with the turnover ratios of businesses with similar characteristics.[22] Plaintiff's net worth turnover ratio in 1966 was 4.2 (sales, $3,926,239, divided by beginning net worth, $926,839); its capital turnover ratio was 1.6 (sales, $3,926,239, divided by beginning capital, $2,460,150). Since neither of the parties has introduced relevant comparative data, it is impossible for the court to assess the significance of plaintiff's turnover ratios. Accordingly, this subfactor has no weight in evaluating the reasonableness of plaintiff's profit.

### Contribution to the Defense Effort

■ Section 103(e)(4) of the Renegotiation Act, 50 U.S.C. App. § 1213(e)(4) (1970), provides that there shall be taken into consideration the—

> [n]ature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance; * * *.

Though plaintiff was a contractor for the civilian space agency, plaintiff is nevertheless entitled to be evaluated under this statutory factor. The Renegotiation Board found that plaintiff's contract did have a direct and immediate connection with the national defense and was, accordingly, not entitled to exemption from renegotiation. The Board's decision on this particular issue is not subject to redetermination in this court.[23] Hereafter, the term "contribution to the space effort" is used synonymously with "contribution to the defense effort."

32 C.R.F. § 1460.13(b) (1974), which fleshes out "contribution to the defense effort," provides:

> * * * Credit will be given under this factor, in such degree as as [sic] the facts may warrant, for * * * (4) experimental and developmental work of high value to the defense effort; * * * (6) performance under difficult environmental or geographical conditions or hazardous working conditions; * * * or (8) performance, assistance, or service considered otherwise exceptional.

The cited subfactors in this regulation apply to plaintiff.

In mid-1965, NASA was interested in the Super Guppy primarily as a mode of transportation for Douglas S-IVB stages, which were used as the third stage of the NASA Saturn-V launch vehicle. The S-IVB stage was so large and heavy that even the Pregnant Guppy, which NASA had been using since 1963, was not capacious or powerful enough to accommodate it. A larger aircraft was needed to carry the stage, which measured 21.7 feet in diameter and 58.3 feet in length and weighed 25,000 pounds unfueled. The Super Guppy, which had a cargo compartment with an inside diam-

---

**22.** 32 C.F.R. § 1460.14(b)(4) (1974). In a report on Recommendation 22, entitled "Practices and Procedures Under the Renegotiation Act of 1951," prepared for the Administrative Conference of the United States by Professor Dennis S. Aronowitz, it is noted that the Renegotiation Board in fact uses specific comparisons with competitors, derived from confidential data or the experience of Board personnel, to evaluate quantitative factors such as profit to net worth, profit to sales, amounts of Government capital employed, and rate of turnover. Aronowitz, Report of the Comm. on Claims Adjudications in Support of Recommendation No. 22 [Practices and Procedures under the Renegotiation Act of 1951], 1 Recommendations and Reports of the Administrative Conference of the United States, 665, 679–80 (1970).

**23.** Section 106(a)(6) of the Renegotiation Act of 1951, 50 U.S.C. App. § 1216(a)(6) (1970), as amended, (Supp. III, 1973), providing for mandatory exemption of "any contract which the Board determines does not have a direct and immediate connection with the national defense," also states that the Board's decision on this issue is not reviewable in this court. Plaintiff requested exemption under this provision of the statute. Exemption was formally denied by the Board.

eter greater than that of the S-IVB stage for 60 feet of its length, was just large enough to hold the S-IVB and had been developed with the dimensions of the S-IVB in mind.

Before the advent of the Super Guppy, the only way NASA had to transport the S-IVB stages was by ocean-going barges from California through the Panama Canal. Ocean shipment via the canal took 4 weeks. Delivery of the stages by air required only 1 day, accelerating delivery by practically the full 4 weeks formerly needed.

Manufacturer's contract delivery dates for the S–IVB stages had been set 4 weeks in advance of the dates they were needed at Kennedy Space Center to provide enough time for delivery by ocean transportation. Nevertheless, the ocean-going barge method was unacceptable to NASA because of the time required to complete each shipment. NASA desired *early* delivery of the stages to gain additional time for testing and provide a hedge against unforeseen development problems.

In fact, NASA considered accelerated delivery so important that in June 1966 it incorporated approximately $26.2 million in schedule incentives into the Saturn I–C stage and Saturn IV–B stage contracts. NASA claimed the value to the space program of accelerated delivery was substantially in excess of this amount. According to NASA's Renegotiation Performance Report on the contractor's 1966 operations (1966 Renegotiation Performance Report), the Super Guppy "resulted in considerable savings in cost and time over other acceptable means of transportation."

The importance of Aero Spacelines' service to the space program is underscored by the agency's rejection in 1968 of plaintiff's proposal to revise the contract to permit Aero Spacelines to carry supplies for other Government agencies. In denying plaintiff's request, NASA stated its position as follows:

> The existing launch schedule for the next 12–18 months, requiring rapid reaction to changing requirements, demands immediate availability of the Guppies. If the Guppies are not under the proximate control of NASA, * * our response time may be seriously jeopardized. This could delay priority cargoes 2–3 days with a resultant impact on launchings and added costs.

As the foregoing facts show, plaintiff is entitled to very favorable consideration for its ingenuity in recognizing the need for and in implementing the means to provide a unique air transportation service which met NASA's need for speed and flexibility in carrying components used in the space program. Plaintiff's 1966 Renegotiation Performance Report noted:

> Aero Spacelines is the only contractor, to date, that has taken the initiative and invested private capital to design, develop and fabricate aircraft capable of transporting outsize cargo such as Saturn Stages.

Plaintiff provided an exceptional service within the meaning of the fourth and eighth subfactors listed in 32 C.F.R. § 1460.13(b).

The frequently difficult conditions under which plaintiff operated (subfactor 6 of the regulation) are discussed, *infra,* in connection with plaintiff's risk and plaintiff's efficiency.

### Extent of Risk Assumed

In determining whether profits are excessive, § 103(e)(3) of the Act, 50 U.S.C. App. § 1213(e)(3) (1970), requires that consideration be given to the "[e]xtent of risk assumed, including the risk incident to reasonable pricing policies." 32 C.F.R. § 1460.12(b)(1) (1974) notes that risks to be considered *include, but are not limited to,* risks incident to close pricing policies. Nonpricing risks enumerated in the regulation are listed by way of example and do not purport to be all-inclusive. However, risks that may be considered in connection with renegotiation may not be "mere speculative or unlikely possibilities." 32 C.F.R. § 1460.-12(b)(1) (1974).

Plaintiff's nonpricing risks can be separated into "business risks" and "operat-

ing risks." These categories have no special analytical significance and are adopted only for convenience in explaining the nature and extent of plaintiff's risks.

### Business Risks

██ Plaintiff's contract with NASA envisioned a total duration of 4 years, yet had to be renewed year by year, at the option of NASA. Contrary to plaintiff's contention, this was not a significant source of business risk, since there was little danger of premature contract termination on the part of the space agency. The parties have stipulated that in December 1965 plaintiff knew of NASA's commitment to place a man on the moon by 1970. Because of this commitment, plaintiff also knew there was a high probability that NASA would continue the contract throughout all of its option periods. NASA ultimately did exercise the options and renew the contract for each of the succeeding 3 years. NASA maintained a program of schedule incentives for the stage manufacturer in order to ensure delivery far enough in advance of the date the stages would be needed to allow reversion to barge transportation. However, this measure was merely a precaution against the possibility that the more desirable air transportation might become unavailable.[24]

A far more significant business risk incidental to plaintiff's performance of contract NAS 8–15476 was the risk that its aircraft, particularly the Super Guppy, would soon become obsolete. Plaintiff's 1966 Renegotiation Performance Report observed:

> Contractor assumes some risk of investment since aircraft was developed by own capital and customer demand for use of aircraft has to date been limited. The nature of the aircraft is such that it is subject to higher obsolescence than is normally recognized with conventional cargo aircraft. * *

Since the Super Guppy had been developed on a limited budget of private capital and on a tight time schedule, many tests which would have been required for commercial certification of a new aircraft by the Federal Aviation Administration were not done. This circumstance did not impair the usefulness of the Super Guppy to NASA because, as a "public aircraft" under the auspices of a particular governmental agency, the plane was exempt from many regulations normally enforced by the FAA and the Civil Aeronautics Board. However, without complying with FAA and CAB regulations, the Super Guppy could not be used for *commercial* cargo transportation after termination of the NASA contract. Testimony at trial indicated that such compliance would require extensive additional modifications and testing. Accordingly, the risk that the Super Guppy would soon become obsolete was real and is an important element of plaintiff's prima facie case.

Like the Super Guppy, the Pregnant Guppy was not commercially certificated. Whether it would be difficult to convert the Pregnant Guppy to commercial use does not appear from the record.

Defendant's expert witness, a specialist in Government procurement, testified that transporting oversize cargoes for NASA enhanced plaintiff's position to enlarge either its service market or its aircraft development and production market through attendant "space age publicity." Plaintiff's association with NASA, the witness stated, enhanced plaintiff's standing in commercial as well as Government markets. This testimony was highly impressionistic and exceptionally difficult to verify. In the absence of any concrete evidence that plaintiff was actually able to capitalize on its position as a NASA supplier, it is found that the assertedly beneficial association did not appreciably offset plaintiff's risk.

---

**24.** NASA's precaution is relevant to the space agency's contemporaneous assessment of plaintiff's operating risks, discussed *infra*.

### Operating Risks

Plaintiff's operating risks during 1966 arose primarily from the circumstances under which the Super Guppy had been developed and from the fact that 1966 was the first year the Super Guppy provided air transportation services under the NASA contract.

Development of the Super Guppy through the stage of wind tunnel testing occurred before plaintiff Aero Spacelines, Inc., acquired Havenhurst. Mr. Kirk Irwin, vice-president of plaintiff and an aeronautical engineer, testified that the amount of wind tunnel testing which had been done on the Super Guppy wind tunnel model was an "insignificant amount" by any standard to which the witness was accustomed. According to Mr. Irwin, limited capital and lack of Government funding, as well as NASA's "very tight needs schedule," permitted only a minimal amount of predictive analysis of performance, stability, and controllability to be done.

Like the wind tunnel testing of the Super Guppy model, the flight test program for the aircraft itself was not extensive. The 96 hours of flight testing done on the Super Guppy were only between one-fourth and one-sixth of the number of hours of tests which would normally be done in the aerospace industry to evaluate comparable airframe modifications.

The flight test program for the Super Guppy took place from August 31, 1965, about 2 weeks after acquisition of Havenhurst by plaintiff, until March 3, 1966. Almost immediately upon completion of the abbreviated flight test program, on March 25, 1966, NASA changed the primary mode of transportation for Saturn-IVB stages from water to air. On April 6, 1966, NASA began airlifting *all* S–IVB stages to Kennedy Space Center. Because the Super Guppy had been developed on a tight time schedule, the aircraft began actual operations with a number of important questions about its flight performance still unresolved. Many tests which would have been re-quired for commercial certification of a new aircraft by the Federal Aviation Agency were not done on the Super Guppy, which was exempted from FAA certification requirements by its status as a "public aircraft" under NASA auspices.

By the time wind tunnel testing of the Super Guppy was completed in May 1965, the aircraft itself was already well along in construction. During the period of construction, a number of structural deficiencies, relative to FAA requirements for commercially certified aircraft, were uncovered in the design of the Super Guppy. Since construction had been under way for some time, rather than requiring correction of the deficiencies, NASA imposed special operating limitations on the Super Guppy. These limitations were more stringent than those normally observed by commercially certified aircraft. As a result, the Super Guppy entered service in March 1966 subject to special operating rules to be observed by Aero Spacelines' flight crews. The Super Guppy was still undergoing evaluation as it entered service, and final flight manual operating limitations were approved by the NASA Super Guppy Ad Hoc Technical Committee on June 21, 1966, more than 3 months after the Super Guppy had begun full contract operations.

Though NASA was willing to accept operating limitations in the interest of getting the Super Guppy into service, uncertainties about the aircraft and special operating limitations were a continuing source of risk to Aero Spacelines, Inc., in performing under its contract with the space agency.

The operating limitations which Aero Spacelines' crews were required to observe created a special insurance risk. The hull, liability, excess liability, and loss of use insurance policies covering the Super Guppy all included or incorporated by reference the following exclusion from coverage:

THIS POLICY DOES NOT APPLY:—

* * * * * *

(3) *While the aircraft* is used for any unlawful purpose or *is operated otherwise than in compliance with* the terms of its Airworthiness Certificate and *the approved operating limitations contained in its Airplane Flight Manual* or other documents associated with the Airworthiness Certificate \* \*. [Emphasis added.]

Plaintiff's expert technical witness testified that where, as in the case of the Super Guppy, operating limitations in the flight manual are more exacting than normal FAA regulations, a pilot must exercise a greater degree of care. There is a correspondingly higher risk that the pilot may violate the flight limitations, rendering the policies inapplicable in case of loss. Although the precise extent of plaintiff's additional risk cannot be quantified, the evidence indicated that flying the Super Guppy was substantially more risky than flying ordinary cargo aircraft.

Since there were no comparable special limitations on the operation of the Pregnant Guppy, which had been flying without mishap since 1963, plaintiff made no special showing of operating risk with respect to the Pregnant Guppy.

Plaintiff's operating risk in 1966 was increased by the need to train new crews to fly both the Super Guppy and the Pregnant Guppy. Before August 1965, when the Super Guppy was flown for the first time, Aero Spacelines had employed 10 crew members, six pilots, and four flight engineers. The advent of the Super Guppy literally doubled Aero Spacelines' fleet, from one to two aircraft, and necessitated training of six more pilots and four more flight engineers. All of Aero Spacelines' 20 flight personnel had to be trained to fly the Super Guppy, and 10 had to learn to operate the Pregnant Guppy. The training period commenced in August 1965 and continued through November 1966.

A ground flight simulator was not available for the Super Guppy, so flight training had to take place in the aircraft. Flight training represents the most critical period of operation of any aircraft. Flight training of crews may actually be more dangerous than flight testing of an aircraft, which is planned in detail and executed under controlled conditions.

Risks inherent in flying the Super Guppy were not merely statistical or speculative, but were evident in the actual experience of the contractor.[25] On September 25, 1965, during flight testing, the blunt nose of the Super Guppy caved in because of insufficient structural strength. The aircraft was able to land safely because inspection hatches and cargo doors in the tail section blew out, preventing the plane, which was scooping in air as it moved forward, from exploding.

In its own planning, NASA recognized the riskiness of plaintiff's 1966 operations. In response to a General Accounting Office report criticizing NASA for relying upon schedule incentives to stage manufacturers to accelerate delivery NASA replied as follows:

*The Super Guppy was a one-of-a-kind aircraft.* It originally was to have been certified by the end of CY 1965. However, due to two major problems in late CY 1965 and early CY 1966 it was not finally certified until 30 March 1966 due to: (1) the aircraft nose caved in during a test flight due to inadequate structural strength, (2) a propeller stress problem. Since prior operational experience with the aircraft was not available and with the problems that the aircraft had just experienced, it would have been very shortsighted and derelict on the part of NASA to, at the same time, make a major adjustment in the S–IVB schedule to compensate for the potential

---

25. 32 C.F.R. § 1460.12(b)(1) states: "In general, the Board will consider whether the contractor's performance of renegotiable business is free from risk, or subject to it, *on the basis of actual experience and not mere speculative or unlikely possibilities.*" (Emphasis added.)

time gained. *There was no assurance at that time (and the only way this assurance could be realized was through operational use and experience) that NASA could totally depend on this one-of-a-kind, outsized aircraft for S–IVB transportation. Until confidence could be built up in this aircraft through usage, NASA elected not to adjust the delivery schedule and thereby retain the capability to revert to S–IVB water transportation without impacting the S–IVB delivery schedule to KSC.* [Emphasis added.] GAO, Report to Congress: Incentive Provisions of Saturn V Stage Contracts 79 (GAO Report B–161366, 1970) (page 40 of Appendix II).

If the Super Guppy had been destroyed, NASA could have reverted to water transportation. Plaintiff, on the other hand, would have lost the revenues generated by the Super Guppy. The Super Guppy accounted for more than half of the guaranteed monthly payment received by plaintiff. If the Super Guppy had not been able successfully to complete its test program, contract NAS 8–15476 provided that the mileage guarantee, analogous to a rental fee for NASA's use of the two Aero Spacelines' aircraft, would be reduced from $243,900 per month, the contract guarantee for both planes, to $120,000 per month, the former mileage guarantee for the Pregnant Guppy alone. Had the services of the Super Guppy been lost during contract operations, a circumstance not specifically covered by the contract, it is virtually certain that a price adjustment would have been required by NASA, exercising its rights under the standard default clause. The Super Guppy was an integral part of plaintiff's operations in 1966, flying 224,588 miles or almost half of the total 474,965 miles flown in 1966 by both of Aero Spacelines' aircraft.

NASA's 1966 Renegotiation Performance Report on plaintiff stated that "Technical and Engineering personnel assistance furnished [by NASA] is not of the nature which would lessen the contractor's risk."

One example of risk cited in 32 C.F.R. § 1460.12(b)(1) (1974), other than pricing risk, which contractors may assume is the risk of guaranteeing—

* * * quality and performance of the product notwithstanding uncertainties as to the quality obtainable from their plants, particularly with respect to products which may be more or less abnormal to them.

At the beginning of 1966, the ability of plaintiff's Super Guppy and new crews to perform without mishap was uncertain. As the quoted regulation suggests, the risk stemming from the uncertainty is an element of plaintiff's prima facie case.

### Pricing Risk

Plaintiff operated under a firm fixed-price contract under which it assumed full responsibility for its costs and bore the entire risk that costs might outrun the established contract price. *Cf. Boeing Co. v. Renegotiation Board,* 37 T.C. 613, 643 (1962), *appeal dismissed,* 325 F.2d 885 (9th Cir. 1963), *cert. denied,* 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). This factor aids plaintiff in establishing its prima facie case.

### Efficiency of Contractor

Section 103(e) of the Act, 50 U.S.C. App. § 1213(e) (1970), provides that in renegotiation, *favorable consideration must be given* to—

* * * the efficiency of the contractor * * * with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; * * *.

Plaintiff has established its entitlement to favorable recognition for efficiency.

A Renegotiation Board regulation, 32 C.F.R. § 1460.9(b) (1974), explains that a contractor's efficiency is judged by the quantity of its production (for example, in relation to available facilities; meeting of production schedules; expansion of facilities); quality of production; re-

duction of costs (for example, a decrease in costs per unit of sales between fiscal years and as compared with contractors producing similar products and having comparable operations); and economy in use of materials, facilities and manpower.

The Renegotiation Performance Report on plaintiff's 1966 operations indicated that plaintiff met contract requirements, including delivery schedules. Plaintiff's meeting its delivery schedules evidenced better than ordinary efficiency. Plaintiff produced credible evidence that special operating limitations, including the need to avoid icing and turbulent conditions, made the Super Guppy an exceptionally difficult airplane to schedule. Despite difficulties in scheduling the Super Guppy, plaintiff met its contract deadlines. The quality of plaintiff's production is, in this case, synonymous with plaintiff's meeting its production schedules.

Plaintiff expanded its facilities in 1966 by doubling its fleet of oversize cargo aircraft from one to two. Plaintiff is, accordingly, due favorable recognition of this fact.

Plaintiff produced no evidence relating its average per mile costs in 1966 to those in earlier years; accordingly, plaintiff has not demonstrated any significant data relating to cost reduction which would assist it in establishing its prima facie case.

Plaintiff's 1966 Renegotiation Performance Report affirms in general terms that plaintiff " * * * was Economical in Use of Materials, Facilities, and Manpower, and was otherwise effective in Controlling Production Costs." Absent effective rebuttal evidence on this point by defendant, plaintiff is accorded favorable recognition for its economy.

### Net Worth and Capital Employed

 Section 103(e)(2) of the Act, 50 U.S.C. App. § 1213(e)(2) (1970), provides that "[t]he net worth, with particular regard to the amount and source of public and private capital employed",

shall be taken into account in determining whether profits have been excessive. 32 C.F.R. § 1460.11(b) (1974), the Renegotiation Board regulation dealing with this statutory factor, states that although the amount of net worth employed will generally be that existing at the beginning of the year, significant changes in net worth occurring during the course of the year must be taken into account. This is such a situation. Plaintiff's ending net worth (shareholder's equity) of $2,206,781 was more than twice its beginning net worth of $926,839. Accordingly, an average of the two figures may be more indicative of the amount of plaintiff's equity than either beginning or ending net worth taken alone. Plaintiff's return on its average net worth of $1,566,810 was 72.31 percent.

Defendant asserts that plaintiff's "112 percent" return on its net worth in 1966 was 24 percent higher than the "88 percent" return on net worth allowed plaintiff in its settlement with the Renegotiation Board for the partial fiscal year ending August 12, 1965. This fact is not helpful in determining whether plaintiff realized excessive profits in 1966 for several reasons:

1. The 112 percent figure is numerically inaccurate if defendant is referring to return on beginning net worth, which was 122 percent for 1966;

2. No evidence appears in the record to illuminate how defendant's expert arrived at the 88 percent profit figure for 1965 or, more specifically, whether he based the figure on beginning net worth, final net worth, or some average of the two if the beginning and final amounts differed significantly. Without knowing how defendant derived the 88 percent profit on net worth figure, the court cannot conclude that that figure provides a meaningful basis for assessing the reasonableness of plaintiff's 1966 return on net worth; and

3. Defendant's choice of beginning net worth as the 1966 basis for comparison disregards 32 C.F.R. § 1460.-

11(b), *supra*, which requires significant changes in net worth during the course of a given year to be taken into account. In fact, plaintiff's return on average net worth in 1966 was 72 percent, 16 percent *lower* than the undocumented 88 percent figure defendant contends plaintiff's predecessor realized during the first part of 1965.

If the Government had so chosen, it might have related plaintiff's 1966 net worth return to that of companies similar to plaintiff. In *LTV Aerospace Corp. v. Renegotiation Board*, 51 T.C. 369, 405 (1968), the Tax Court implied that for net worth return data to be meaningful, the court must be told, at the minimum, "what an average rate of return would be for a company like" the plaintiff.

Plaintiff, it is true, provided a unique air transportation service for oversize cargoes using only two aircraft, both of which it had fabricated itself. It does not follow, however, that no relevant comparisons can be made between plaintiff and, for example, companies which provide more conventional air transportation services. If there are limitations to such a comparison or if air frame manufacturers' rates of return are a more appropriate basis for comparison, the parties should at least address these issues. Without meaningful comparative data, with respect either to plaintiff's own prior experience or to the experience of an industrial group demonstrated to have some relevance as a basis for comparison, the court has no yardstick with which to assess the net worth statutory factor and is asked, in effect, to determine excessive profits in a factual vacuum.[26]

The net worth statutory factor requires that "particular regard [be given] to the amount and source of public and private capital employed." Capital employed is defined in 32 C.F.R. § 1460.-

---

**26.** The court takes judicial notice that industrial statistics relevant to renegotiation are available in reliable and readily available sources. For example, the Internal Revenue Service publishes annually statistics of income compiled from corporation income tax returns and broken down by major and minor industries. This annual compilation includes aggregate data on business receipts, cost of sales and operations, net income, taxable income, total assets, net worth, depreciable assets, and annual depreciation. In this instance, data are provided both for transportation equipment: aircraft, guided missiles and parts, and for air transportation. Internal Revenue Service, Statistics of Income 1966: Corporation Income Tax Returns. For manufacturing corporations, the FTC and SEC jointly published a quarterly financial report for manufacturing corporations, containing much the same data. In addition, of relevance to this particular case, the Aerospace Industries Association of America, Inc., also publishes annually a compilation of aerospace facts and figures. *See* Aerospace Industries Assoc. of Am. Inc., Aerospace Facts and Figures: 1967 (containing 1966 data).

Moreover, the parties may have recourse to general, aggregate industry performance data actually relied upon by the Renegotiation Board. Professor Aronowitz suggests in his report to the Administrative Conference of the United States on the practices and procedures of the Renegotiation Board that much composite data used by the Board " * * * was derived from public sources, * * *; other composite data appeared to be derived from the Board's own experience with a particular industry but was sufficiently generalized so as to be publishable without risking violation of the confidentiality restrictions" imposed upon the Board by 18 U.S.C. § 1905 (1964) and the Internal Revenue Code of 1954, § 7213. Aronowitz, *supra* note 22, at 680.

Introduced as evidence by the parties, such information would fit within the hearsay exception, set forth in the recently enacted Federal Rules of Evidence, Rule 803(17), for—

"*Market reports, commercial publications.* Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations."

Although these sources also appear to meet the requirement of Federal Rule of Evidence 201 for judicially noticeable facts, which must be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," the court declines to take judicial notice of specific items of comparative information because of the difficulty of identifying and making the relevant comparisons without assistance from the parties. *See* the analogous refusal by the Tax Court to take judicial notice of "learning curve" evidence and findings in another case, citing "the difficulty we would face in interpreting such data if it were before us," in *LTV Aerospace Corp. v. Renegotiation Board, supra* at 402.

11(b)(3) (1974) as "the total of net worth, debt, and any assets furnished by the government or customers not contained in the contractor's records." The source of capital employed is relevant for renegotiation because " * * * where a contractor risks relatively little of its own capital it is primarily a manager of property, and thus not entitled to as great a return for risk-taking as a contractor which supplies its own assets." *LTV Aerospace Corp. v. Renegotiation Board, supra* at 405. Furthermore, " * * * a contractor which uses its own assets is entitled to an element of return equivalent to the rental value of the assets; a contractor using the assets of others is not." *Id.*

It should be noted at the outset that plaintiff utilized primarily its own capital. Capital provided by plaintiff itself in 1966 averaged $2,801,916. Defendant argues that plaintiff's profit should be reduced because the Government provided plaintiff with surplus aircraft parts, engines, and propellers at no cost during 1966. Although the "stated value" or undepreciated original cost to the Government of this equipment was $1,424,476, defendant failed to introduce any evidence to show what value the aircraft parts had in 1966. It is impossible, therefore, for the court to estimate accurately what proportion of the total capital employed by plaintiff was supplied by the Government.[27]

Furthermore, as the Tax Court observed in *LTV Aerospace Corp., supra* at 405, it does not necessarily follow that a contractor which uses capital supplied by others is entitled to a smaller *rate of return on its own net worth.*

Unlike the situation contemplated by 32 C.F.R. § 1460.11(b)(4) (1974), in which a "contractor's contribution tends to become one of management only," plaintiff had a substantial quantity of its own capital at risk in performing under contract NAS 8–15476. It is true as an

abstract proposition that a contractor performing a particular service with a given quantity of capital supplied only in part by itself is entitled to less profit than a contractor which performs the same service with the same amount of capital completely provided by itself. However, defendant has failed to relate this basic principle of renegotiation to the facts of this case.

Defendant, after pointing out that plaintiff was paid promptly for its services, argues that capital for plaintiff's operations was provided to a considerable degree by defendant. Implicit in defendant's argument is the idea that plaintiff was thus relieved of the cost of borrowing working capital. As was the case in *LTV Aerospace Corp. v. Renegotiation Board, supra* at 406, where the Government made a similar argument, no payments were made until after the services had been rendered. Plaintiff bore all expenses under its contract and paid labor, fuel, and other costs as they were incurred; plaintiff did not invoice the Government for miles flown until *after* the miles were flown. Therefore, as the Tax Court ruled in the *LTV Aerospace* case, plaintiff "is not entitled to prices which include amounts to cover the costs of borrowing working capital, but that fact does not justify reducing [plaintiff's] allowable profit." *Id.* Defendant has provided no evidence suggesting that the negotiated contract price included provision for costs of borrowing working capital later made unnecessary by the Government's prompt reimbursement of plaintiff.

Repair and maintenance expenditures were similarly paid promptly. Although prompt reimbursement of these expenses probably reduced plaintiff's need to borrow money for repairs, defendant provided no evidence of what specific impact, if any, prompt payment had on plaintiff's profitability. Furthermore, defendant provided no evidence suggesting that prompt payment for miles flown

---

**27.** The Tax Court similarly declined to speculate about the amount or percentage of total capital supplied by noncontractor sources in

. *LTV Aerospace Corp. v. Renegotiation Board, supra* at 405.

and for repair and maintenance costs was not taken into account in establishing the amount plaintiff would be paid under contract NAS 8–15476. On the contrary, defendant's witness testified at trial that " * * * payment procedures may be negotiated between the government and the contractor in each case * * * " as one of the variables in setting the contract price.

The Government's expert witness observed that a majority of fixed-price production contractors receive payment only after they have completed delivery of the goods contracted for, implying that plaintiff somehow received more favorable treatment than is normally given Government contractors. Assuming the witness' comparison of a contract for delivery of goods with a contract for provision of a service to be a valid one, plaintiff does not suffer from such a comparison because it was not paid for transportation of Government freight until after the service was completed.

Like the rate of return on net worth, rate of return on capital employed is meaningful only in the context of relevant comparisons with the net worth and capital returns of other firms. The record in this case is devoid of such comparisons.

As the preceding discussion indicates, the evidence fails to show that plaintiff's 1966 profits were excessive when measured by the net worth and capital statutory factor.

*Reasonableness of Costs and Profits*

Section 103(e)(1) of the Act, 50 U.S.C. App. § 1213(e)(1) (1970), directs that in determining whether excessive profits have been realized, there shall be taken into account the "[r]easonableness

of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products." The focus of this statutory factor is twofold because it is concerned both with the reasonableness of a contractor's costs and with the separate issue, the ultimate one in renegotiation, reasonableness of the contractor's profits.[28]

As the renegotiation statute itself suggests and as 32 C.F.R. § 1460.10(b) (1974) makes explicit, reasonableness of a contractor's costs and reasonableness of its profits must be determined on the basis of relevant comparisons. The regulations makes many references to comparative data, including the following:

(b)(1) * * * Comparisons will be made with the contractor's own costs and profits in previous years and with current costs and profits of other contractors, if such information is available. * * * Low costs with relation to other contractors, when clearly established and shown to be the result of efficiency in management, are especially significant and must receive favorable consideration. * * *

(2) Consideration for comparative purposes will be given to profits of the contractor, and of the industry, on products and services not subject to renegotiation, especially in cases in which the renegotiable business involved products or services substantially similar to those not subject to renegotiation. * * *

As noted, *supra*, renegotiation is a system of variable profit rewards intended to recover excessive profits without impairing incentives for Government contractors to distinguish themselves by innovativeness and efficiency. A contractor's entitlement to profit is to be a

---

**28.** In two of its renegotiation decisions, the Tax Court expressly declined to treat reasonableness of profits as other than the ultimate issue in the case:

"The question of the reasonableness of Temco's profits is too closely tied with the question of the existence and amount of excessive profits to be considered separately from that

question." *LTV Aerospace Corp. v. Renegotiation Board, supra* at 408.

"As to the 'reasonableness' of petitioner's profits it is enough to say this will be the ruling consideration in this proceeding." *North Am. Aviation, Inc. v. Renegotiation Board*, 39 T.C. 207, 228 (1962).

function of the excellence of his contribution. A reasonable profit can be established only on a comparative basis because it is impossible to say what a particular product or service is intrinsically worth.

The regulation cited above broadly recognizes two types of comparisons: (1) comparison with the contractor's own prior performance and profitability, and (2) comparisons with profits of the contractors and of the industry on similar products or services. Comparisons, of course, have varying degrees of probative weight depending upon how close they are demonstrated to be.

As discussed, *supra,* in connection with plaintiff's risk, plaintiff operated under a firm fixed-price contract which obligated it to bear any increases in the cost of performance without passing them on to the Government. The amount of risk assumed by a contractor under a firm fixed-price contract depends upon how realistic his cost estimates are and upon the "closeness" of his pricing, the margin between the anticipated costs and the price set to cover costs and yield a profit.

Defendant has not directly questioned the *reasonableness of the 1966 cost figures* actually shown on plaintiff's accounting statement for renegotiation. Instead, defendant argues, in effect, that the price originally set in contract negotiations "must have" generated an unreasonably high profit for plaintiff because "the reasonableness of plaintiff's costs has been questioned from the outset." Defendant urges that NASA was handicapped in negotiating with plaintiff because a NASA auditor was denied access to records that would reveal plaintiff's investment in the Super Guppy, a figure needed to enable NASA to prepare an estimate of plaintiff's annual depreciation costs.

This argument does not shed much light on the central issue of this case, which is whether *profits actually realized*

*in 1966* were reasonable or excessive. It is instead an implicit appeal to the court to second guess NASA's negotiators by repricing the contract. This the court will not do. Although renegotiation was originally conceived " * * * as a procurement function, a repricing procedure in connection with specific contracts, * * * " this view of renegotiation " * * * became subordinated to the idea of an over-all retroactive recovery of excessive profits."[29] Renegotiation has come to be "increasingly divorced from procurement in both philosophy and administration."[30] This court clearly outlined the distinction between procurement and renegotiation in *Newport News Shipbuilding & Dry Dock Co. v. United States,* 374 F.2d 516, 526, 179 Ct.Cl. 97, 108 (1967):

> * * * the Renegotiation Act provides for the recovery of excessive profits not on a contract-by-contract basis, but upon the basis of all receipts and accruals from all covered contracts during the relevant fiscal year. 50 U.S.C. App. § 1213(f). Under renegotiation, the contractor's costs are determined, on an overall fiscal year basis, based upon deductions allowable under the Internal Revenue Code—not upon cost standards established by the Armed Services Procurement Regulations. * * * It was incumbent upon government procurement officials to administer contracts to insure that the prices obtained were fair and reasonable. 32 CFR (Rev.1954, Cum. Supp.Jan.1960), § 3.808–1. But if negotiations pursuant to contractual price redetermination, or escalation provisions, etc., still result in contractors obtaining excess profits on the basis of over-all receipts and accruals during a fiscal year, then the Renegotiation Act provides a procedure to recapture the excess—establishing what amounts to a last chance for the elimination of excessive profits. Renegotiation is thus "focused on recapture of

---

29. R. C. Osborn, *supra* note 13, at 99.

30. J. Miller, The Pricing of Military Procurements 174 (1949).

excessive profits rather than on prevention by repricing;" it is "a supplement to effective pricing"—not a substitute. Braucher, *Renegotiation Act of 1951*, 66 Harv.L.Rev. 270, 276, 312–13 (1952). [Footnote omitted.]

Even if renegotiation were a repricing procedure, defendant has failed to show that NASA was prejudiced in its dealings with plaintiff because of withheld information. On the contrary, the record shows NASA's cost analysts to have been vigilant and aggressive in dealing with plaintiff. The contractor's proposed costs were pared substantially in developing the basis for NASA's rate proposal. NASA compensated for plaintiff's early failure to provide cost information for the Super Guppy, which had not yet been completed, by estimating a conservatively low value for the aircraft. In fact, the estimated value was only 60 percent of the $1,714,395 value which the parties stipulated at trial. In any event, defendant did obtain the information it required before executing the contract with plaintiff. The NASA 1966 Renegotiation Performance Report noted, contrary to the inference defendant would have the court draw, that " * * * sufficient operating cost history was available from which to establish acceptable prices." Moreover, the report specifically mentioned that NASA had treated plaintiff's depreciation estimates with skepticism.

Defendant made no attempt to compare plaintiff's costs in prior years with its 1966 costs, arguing that the advent of the Super Guppy made such comparison irrelevant. The excerpt from NASA's renegotiation performance report quoted immediately above contradicts defendant's position.

Defendant's comparison of plaintiff's profits in 1966 with profits earned by plaintiff and plaintiff's predecessor in prior years is far too sketchy to assist the court in determining whether plaintiff's profits were abnormally high in the fiscal year under review. Defendant asserts that the profit figures recommended by defendant's expert were slightly lower than those for FYE August 12, 1965, as renegotiated. Like defendant's net worth comparison, this comparison is not useful because defendant does not explain how the 1965 figures are derived. It is impossible, therefore, to know whether the 1965 rates of return provide a basis for valid comparison.

Defendant justifies the smaller percentage profit allowance recommended by its expert witness by arguing that risks assumed by Havenhurst during development of the Super Guppy were more substantial than those incurred when the Super Guppy was in actual contract operation. This contention is not supported by the record, which fails to suggest any measurable difference in the amount of risk during development of the Super Guppy as compared with operational risks during actual use.

Defendant explains that its expert witness could not compare plaintiff's cost and profits with those of other contractors because plaintiff was the sole source of oversize air transportation meeting NASA's requirements. To accept defendant's explanation of its failure to find relevant comparisons either in, for example, the air transportation or airframe manufacturing industry is to conclude that comparisons can never be made when a product or service is unique. 32 C.F.R. § 1460.2(c) (1974) does not take so limited a view of what comparative information is useful in renegotiation. The regulation specifies—

> In evaluating the contractor's performance, comparisons will be made with the prices, costs and profits of other contractors engaged in the production of the same *or similar* products or using the same *or similar* processes. [Emphasis added.]

The wording of the regulation is general enough to suggest the relevance of industry comparisons even when there is no identical product or service.[31]

---

31. The Report of the Joint Committee on Internal Revenue Taxation Relating to Renegotiation, S.Doc.No.126, 84th Cong., 2d Sess. 8 (1956), describing Renegotiation Board proce-

Defendant's claim that industry comparisons were unavailable appears to rest upon a mistaken analogy drawn from antitrust law. In antitrust, the relevant market is the product market, whose outer boundaries, for the purpose of assessing the extent of competition, are governed by the "reasonable interchangeability" of products and services offered for sale. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In renegotiation, however, where the focus is upon profit opportunities rather than upon the existence or absence of marketplace competition, the relevant markets are the markets for capital investment, risk taking, and entrepreneurial skill. The boundaries of these markets are necessarily wider than the boundaries of individual product markets, and meaningful comparisons can be made over a broader range.

NASA's 1966 Renegotiation Performance Report on plaintiff further undermines defendant's assertion that no industry comparisons were available to assess the reasonableness of plaintiff's profits. The report stated that although "[r]ealistic comparison of prices with competitors' prices cannot be made as contractor's aircraft is unique to other commercial and military cargo aircraft [,t]he per mile flight cost compares favorably with commercial and military rate experience assuming maximum flight schedule is experienced." The report noted in addition that NASA considered plaintiff to be an average cost producer during 1966. Since defendant has nonetheless chosen not to rely upon industry comparisons, this valuable source of comparative data is not available to the court as the basis for its decision.

Defendant is correct in asserting that the proportion of plaintiff's nonrenegotiable sales was so small—less than one thousandth of plaintiff's total sales in 1966—that plaintiff's profit on products and services not subject to renegotiation does not provide a meaningful basis for comparison in this case. Defendant is also correct in rejecting comparison of plaintiff's wartime profits, of which there were none, and peacetime profits.

32 C.F.R. 1460.10(b)(3) (1974) provides:

Favorable consideration will be given to an increase in volume of production for defense purposes. On the other hand, when the Government's demand has enabled the contractor to increase his sales without exceptional effort and without corresponding increases in costs, decreased unit costs result, and the Government should normally get the principal benefit *in more favorable prices, or in renegotiation.* [Emphasis added.]

The number of miles actually flown by plaintiff in 1966 was greater than the number of miles for which the contract guaranteed plaintiff it would be paid. Defendant's expert witness took this into account by recommending that plaintiff be allowed a lower rate of profit on the extra miles flown. The witness' stated rationale for this reduction was that the additional sales were, he assumed, not anticipated by the contracting parties and that plaintiff's overhead costs would not be increased by the additional miles flown. This analysis is faulty because it fails to take the applicable regulation, cited immediately above, into account.

The regulation provides that favorable consideration will be given when sales are increased to accommodate additional Government demand. Any such favorable consideration is subject to the proviso that the Government should get the principal benefit of decreased unit costs either in lower prices or in renegotiation. In this case, the Government has already reaped the benefit of reduced prices for additional miles flown because of the way contract NAS 8–15476 was originally negotiated.

The contract provided for 18,000 miles of guaranteed usage per month at an

dure, indicates that the Board relies upon "cost comparison with other firms where the same product is involved" and "relative profit to sales ratios of similar firms where there is no identical product."

average rate of $12.92 per mile.[32] Miles flown in excess of the guarantee were to be compensated at the rate of $3.15 per mile for flights carrying freight and $3.05 per mile for return flights without cargo. Accordingly, the more miles plaintiff flew in excess of the guaranteed number of miles, the lower the unit cost to the Government would be. In 1966, plaintiff flew a total of 474,965 miles. By dividing $3,624,614, the total amount which plaintiff was paid for air transportation services in 1966 by the 474,965 miles flown, the court finds the average cost per mile to the Government to have been $7.63. A reduction in unit cost to the Government was, accordingly, built into NASA's contract with plaintiff. Defendant's witness did not explain why a further reduction in profitability *in addition to* the price reduction provision written into plaintiff's contract with the Government is necessary to make plaintiff's profits nonexcessive.[33]

By presenting evidence respecting the character of its business, its contribution to the defense effort, the extent of risk assumed, and its efficiency, plaintiff has established a prima facie case within the meaning of the *Lykes* decision. In view of plaintiff's positive showing with respect to these statutory factors, combined with the lack of meaningful comparative information provided by either party under the source of capital and reasonableness of costs and profits statutory factors, it is not self-evident that plaintiff's 1966 profit of 28.85 percent of sales was excessive. Without more information, it is impossible to say that any particular amount of plaintiff's 1966 profits was excessive.

We now turn our attention to consideration of defendant's affirmative arguments that plaintiff did realize excessive profits.

*Defendant's Case for Excessive Profits*

In the *Lykes* case, this court held that once plaintiff has discharged its prelimi-

nary burden of going forward with proof as to the statutory factors upon which it relies, the burden shifts to the defendant to rebut the contractor's contentions and prove the extent of excessive profits realized. 459 F.2d at 1401–02, 198 Ct.Cl. at 326–27.

Defendant assumed this burden at trial by presenting Mr. James E. Cravens, a contract manager and cost analyst employed by the Navy, as its sole witness. Mr. Cravens, a defense procurement expert, is a specialist in contract negotiation and pricing. Despite his impressive credentials in Government procurement as a contract manager and cost analyst, the witness considered himself neither an accountant nor an economist.

Defendant's expert testified that, in his opinion, plaintiff's profit of $1,132,940 during 1966 was excessive by $378,000 and that a reasonable profit would have been $754,940. After adjustment, not made by defendant, on account of state taxes attributable to the nonexcessive portion of plaintiff's profits (32 C.F.R. §§ 1459.9(a), (b)(2) (1974)), plaintiff's profits would be $766,425, or 21.53 percent of plaintiff's adjusted sales. Mr. Cravens' recommendation exceeds the unilateral order of the Renegotiation Board by $129,917. The Board's order left plaintiff with adjusted profits of $896,342, or 24.29 percent of adjusted sales. As noted *supra*, plaintiff's actual 1966 return on sales was 28.85 percent.

Mr. Cravens based his opinion upon a *modified version* of the Weighted Guidelines Method, a procurement technique used by contracting officers of the Department of Defense (DOD) to establish profit objectives during contract negotiations. The manner in which the Weighted Guidelines are to be applied in a procurement situation is illustrated in Armed Services Procurement Regulation (ASPR) 3–808, 32 C.F.R. 3–808 (1974).

Briefly, contract performance is broken down into its different cost elements, such as materials, labor, general

---

**32.** This figure is a weighted average, which takes into account the fact that monthly guarantee rates fluctuated during 1966.

**33.** More fundamental difficulties with the profit analysis of defendant's expert are discussed *infra*.

and administrative expense. Profit amounts are assigned to each element of cost. These amounts may vary, within a specified range prescribed by the weighted guidelines ASPR, depending upon the difficulty of procuring the material or the sophistication of the service provided. In addition, contractors may receive additional profit, computed as a percentage of their *total* costs of performance, for assumption of contract cost risk, quality of past performance, selected factors (source of resources and special achievement), and special profit consideration (development of new items without Government assistance).

In documenting his decision to allocate a particular percentage of profit to a given contractor input, a contracting officer must *explain in detail* why he assigned a particular profit increment to each element of contract cost. This requirement is intended to insure fairness to the contractor, make certain the public interest has been considered, and provide a basis for subsequent review.

The weighted guidelines do not purport to be a retrospective technique for determining the overall reasonableness of a contractor's profits in a given fiscal year, but were designed primarily to aid contracting officers in negotiation. 32 C.F.R. 3.808–2(a)(1) provides:

> The weighted guidelines method provides contracting officers with (i) a technique that will insure consideration of the relative value of the appropriate profit factors described in 3.808–4 *in the establishment of a profit objective and the conduct of negotiations; * * *.* The contracting officer's analysis of these profit factors is based on information available to him prior to negotiations. * * * [Emphasis added.]

■ Plaintiff objects strenuously to Mr. Cravens' use of a method patterned on the weighted guidelines, charging that the technique results in retroactive cost-plus-a-percentage-of-cost contracting, which Congress forbade in the Armed Services Procurement Act of 1947, ch. 65, § 4(b), 62 Stat. 23, 10 U.S.C. § 2306(a) (1970). That act states flatly: "The cost-plus-a-percentage-of-cost [CPPC] system of contracting may not be used." Plaintiff's objection on this ground to profit analysis based on the weighted guidelines is valid. The weighted guidelines themselves survive the charge that they are a form of CPPC contracting when used prospectively as an aid in contract negotiation. This is so because once the profit objective is set, the contractor cannot increase his profits by increasing his costs, as is possible under the proscribed cost-plus-a-percentage-of-cost system of contracting. However, use of a system based upon the weighted guidelines in *renegotiation* is fraught with danger. Renegotiation is necessarily a retrospective process. If a cost-based system of profit analysis were to be adopted by the court for renegotiation determination, contractors would be on notice that higher costs would yield the potential for greater allowable profits in renegotiation.

32 C.F.R. 1460.8(a) (1974) states that as a matter of general renegotiation policy—

> [r]easonable profits will be determined in every case by overall evaluation of the particular factors present and not by the application of any fixed formula with respect to rate of profit, or otherwise. *Renegotiation proceedings will not result in a profit based on the principle of a percentage of cost.* [Emphasis added.]

In his article entitled "The Renegotiation Act of 1951," Robert Braucher noted:

> [The] danger [of impairing incentives to efficient performance inherent in any form of profit limitation regime] was clearest when profits were fixed as a percentage of actual cost and there was a positive incentive to wasteful cost increases designed to increase the allowable profit.[34]

---

**34.** Braucher, *The Renegotiation Act of 1951*, 66 Harv.L.Rev. 270, 271 (1952).

A particular danger of applying any cost-plus method of profit analysis in renegotiation is that rewarding efficient performance is a basic imperative of renegotiation law. Accordingly, the renegotiation process must be as free as possible from methods known to be detrimental to promotion of efficiency.

Defendant's use in this case of a method of analysis patterned on the weighted guidelines, a Department of Defense procurement technique, is suspect for a further reason. As plaintiff points out, defendant's expert witness noted in his pretrial statement that NASA studies in 1964 and 1965 had concluded that the "weighted guidelines" method for developing prospective profit amounts and rates was not suitable for NASA. The space agency observed that the formula approach applied to the broad scope of DOD procurement " * * * did not have coequal application to the generally one-of-a-kind programs in NASA." Mr. Cravens did not disagree with NASA's judgment in his pretrial statement, and nowhere did the statement suggest that the witness intended to rely on the weighted guidelines as the basis for his testimony. At trial, Mr. Cravens did not enumerate the reasons which led him, apparently, to change his mind. Nor has defendant demonstrated by any other evidence the relevancy of the weighted guidelines technique proposed by its expert witness or the impropriety of NASA's rejection of the weighted guidelines.

The witness testified that the weighted guidelines method was developed by the Logistics Management Institute and the Department of Defense "after looking at several thousand contracts during 1962 and 1964." He did not testify to the nature of the defense contracts upon which the weighted guidelines has been based, nor did he assess the relevance or comparability of those contracts to the unique oversize air transportation service provided by plaintiff.

As indicated, *supra*, the renegotiation regulations, Tax Court opinions, as well as scholarly comment, all emphasize the importance of making comparisons with a relevant industry. This court can insist upon no less.

Comments submitted to a Subcommittee of the House Committee on Government Operations by Lawrence E. Hartwig, then Chairman of the Renegotiation Board, explained:

> Under the Act contractors are renegotiated on an over-all, fiscal year basis, that is, the determination of excessive profits, if any, is applied to the aggregate renegotiable profits of a contractor. This does not mean, however, that the evaluation—the analytical process—preceding a Board determination is also conducted on aggregate lines. Quite the contrary. *If a contractor is active in diverse industrial fields, he is required to provide the Board with a separate statement of the costs and profits of each of his major activities, together with information sufficient to enable the Board to evaluate such activity separately under the statutory factors.*[35]

Defendant's expert admitted, in fact, that the weighted guidelines method would *not* provide an equitable means for establishing a rate of profit for plaintiff unless the actual weightings of 32 C.F.R. 3.808–4 (1974) were abandoned for higher percentages than those permitted by ASPR's weighted guidelines. The witness estimated that the weighted guidelines would be suitable without modification for only a third or a fourth of NASA contracts. For the rest, including the contract involved in this case, the method would be proper only if the weights were appropriately adjusted to reflect elements such as a contractor's exceptional contribution or extraordinary risk. In actual defense procurement, the profit figure chosen by the contracting officer *may not exceed the weighted*

---

35. *Hearings on Renegotiation Board Operations Before the Government Operations Subcomm. of the House Comm. on Government Operations*, 92d Cong., 1st Sess., pt. 2, Appendix at 42 (1971) [emphasis added].

*guidelines percentage range.* At trial, defendant's witness proposed modifications, in his discretion, of the weighted guidelines profit percentages in order to reach an "equitable" result.

In *Bethlehem Steel Corp. v. United States,* 511 F.2d 529, 531, 206 Ct.Cl. ——, —— (1975), *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975), a case dealing with the weighted guidelines in a situation involving review of a decision of the Armed Services Board of Contract Appeals, the court referred to "the remedial effect of a guideline regulation, any regulation, as against the assignment of a 'roving absolutism' to a Contracting Officer in granting or denying escalation."

■ As an expert witness rather than an administrative official in the discharge of his duties, Mr. Cravens was not obligated to adhere to the weighted guideline regulation. But by deviating from the weight ranges prescribed in the ASPR, the defendant's witness not only, in effect, conceded the inapplicability of the weighted guidelines to this case, but also deprived the guidelines of their value as restraints on discretion. In an attempt to lend greater credibility to his testimony, the expert witness couched his personal conclusions in the same format as the weighted guidelines. In the *Bethlehem Steel Corp.* case, *supra,* the court warned against "reversion to * * * 'do it yourself guidelines' * * *" and stated the "implicit requirement * * * that the purported 'rule' should really have general application and not be just an attempt to influence a lawsuit." *Id.,* 511 F.2d at 532, 206 Ct.Cl. at ——. This does not in itself imply that the conclusions of defendant's witness were incorrect, but only that the court must assess the testimony as the opinion of a single expert witness rather than as an application of a procurement regulation to the facts of this case.

The testimony of defendant's expert witness was based upon a hypothetical situation presented to the witness by counsel for defendant. The following inaccuracies in the facts of the hypothetical or in the witness' inferences drawn from it undermine the validity of the ultimate conclusions reached by the expert.

1. Mr. Cravens' conclusion that plaintiff did not provide air transportation services with more than ordinary efficiency failed to take into account the difficult operating conditions, previously discussed, which rendered plaintiff's consistent meeting of delivery schedules a substantial accomplishment. Related testimony by defendant's expert witness that the conditions under which plaintiff performed oversize air transportation services for NASA during 1966 were normal for the performance of air transportation services is contrary to the weight of evidence in the record, which underlines the unique nature of the service provided by plaintiff.

2. The hypothetical presented to defendant's witness at trial greatly minimized the significance of plaintiff's contribution to the aerospace effort. In asking the witness to assume that delivery of S–IVB stages would not have been materially affected in the event that the Super Guppy could not have been used, defendant's counsel neglected to outline to the witness NASA's intensely felt need for the services of the Super Guppy in order to secure additional time for reliability testing and contingencies.

3. When asked at trial whether he had considered any losses incurred by plaintiff in performing contracts in other years similar to the contract being renegotiated, Mr. Cravens testified that according to information available to him, plaintiff did not sustain monetary losses in two prior periods. The witness did not discuss the implications of the 1965 structural accident which almost resulted in loss of the Super Guppy during flight testing.

To the extent the hypothetical situation presented to defendant's witness did not accurately characterize the service plaintiff provided to the Government in 1966, the probative value of the witness' testimony is diminished.

Despite the Government witness' stated performance for the weighted guidelines technique as a means of determining what would be a reasonable profit for plaintiff, his testimony indicated he did not use the method as an independent analytical tool. His reasoning, as he explained it at trial, gave the Board's determination a presumption of validity impermissible in a de novo proceeding in this court.

Defendant's expert witness illustrated his conclusion that a reasonable profit for plaintiff during 1966 would be $754,940 by reference to a table presented here in consolidated form:

TABLE I

| Plaintiff's cost submission filed with Renegotiation Board | | A Average profit rate | A Amount | B Maximum profit rate | B Amount | (C-1) Effect of sales over estimate 75% of (b) | (C-1) 25% of (a) | C Composite 75%(b) + 25%(a) | (a) |
|---|---|---|---|---|---|---|---|---|---|
| Material | $35,706 | 2% | $750 | 4% | $1,500 | $1,130 | $190 | $1,320 | 3.7 |
| Direct labor | $522,897 | 12 | 62,800 | 12 | 62,800 | 47,100 | 15,700 | 62,800 | 12.0 |
| Direct operating expenses | $1,405,803 | 7.3 | 102,050 | 11.4 | 160,800 | 120,600 | 25,510 | 146,100 | 10.4 |
| Fuel and oil | 353,633 | {2— | (7,100) | {4— | (14,150) | | | (12,300) | 3.5 |
| Insurance | 118,980 | {6— | (7,100) | {8— | (9,520) | | | (8,920) | 7.5 |
| Depreciation | 316,257 | {12— | 38,100 | {23— | 75,100 | | | (65,800) | 20.8 |
| Training/engineering | 6,473 | {15— | 970 | {15— | 970 | | | 970 | 15.0 |
| Other | 610,600 | {8— | 48,780 | {10— | 61,060 | | | (58,000) | 9.5 |
| General and administrative expenses | $500,378 | 7.9 | 39,450 | 10.2 | 51,800 | 38,850 | 9,860 | 48,710 | 9.7 |
| Officers' salary | 127,004 | {10— | 12,700 | {12— | 15,250 | | | (14,620) | 11.5 |
| Other salary | 84,344 | {7— | (5,900) | {8— | (6,750) | | | (6,530) | 7.8 |
| Other expenses | 289,030 | {7— | 20,850 | {10— | 28,800 | | | (27,580) | 9.5 |
| Adjustment | $328,425 | 6 | 19,750 | 8 | 26,000 | 19,500 | 4,930 | 24,430 | 7.4 |
| Cost of sales | $2,793,299 | 8.1 | 224,800 | 10.8 | 302,900 | 227,180 | 56,190 | 283,370 | 10.1 |
| Risk/contract type | | 7.4 | 206,800 | 10.6 | 295,500 | 221,630 | 51,650 | 273,280 | 9.8 |
| Performance | | 2.1 | 59,100 | 2.1 | 59,100 | 44,320 | 14,810 | 59,130 | 2.1 |
| Exceptional contribution | | 7.9 | 220,440 | 7.9 | 220,440 | 189,160 | | 139,100 | 5.0 |
| Profit: *recommended* percentage and amount | | 25.5 | 711,140 | 31.4 | 877,940 | 632,290+ | 122,650 | 754,940 | 27.0 |
| Refund due based on $1,182,940 realized | | | 421,800 | | 255,000 | | | 378,000 | |

Mr. Cravens identified the first column of the table as the "elements of cost presented by the contractor, to the renegotiation board." This column, with two significant exceptions discussed *infra* accurately reflects plaintiff's stipulated 1966 costs.

The next column, A, Mr. Cravens described as "an average rate of most contractors in a service area, in performing a unique service for the Government." As noted above, Mr. Cravens did not testify to the nature of the services for which column A would represent an "average" rate of profit or relate the nature of those services to the type of service performed by plaintiff. Mr. Cravens did not offer specific explanation of why particular percentages of profit should be allowed on individual items of cost. For example, although he recommended that 8 percent profit be allowed on plaintiff's "Other Direct Operating Costs," he neither mentioned that these expenses included items as disparate as "aircraft crew per diem and travel expenses" and "repairs and maintenance," nor explained why an overall rate of 8 percent profit on expenses of this nature would be appropriate.

Mr. Cravens testified that column B, labeled "maximum profit rate/amount" represented approximately what the Renegotiation Board had concluded. The witness explained that he had been asked, sometime in August or September of the year preceding the trial—

> * * * to come up with a ballpark figure to determine if the renegotiation board's figures had included all of the elements of cost in the contractor's input, and to see what comparison would be made in that area.

Column B lacks documentation essential to give it stature independent of the Renegotiation Board's result. Although the witness referred to column B as a "ballpark figure," he did not relate any of the individual profit amounts appearing in column B to amounts allowable under the weighted guidelines for comparable inputs by other Government contractors. In fact, the impression conveyed by Mr. Cravens' testimony was that column B was created simply to explore what weighted guidelines profit percentages would be needed to generate a result close to that reached by the Board. This is brought out by the following circumstances:

> (1) Early in his testimony, the witness described the weighted guidelines as "only a discipline to cover each item of the cost summation as made by the contractor" "to insure that every item of cost input for the contractor and all the contractor's performance, affecting the contract were considered;"
>
> (2) A later colloquy between counsel for defendant and Mr. Cravens suggested that the witness worked backward from the Board's result to see what weighted guidelines percentages would correspond to the profit amount allowed the contractor in the Board's unilateral order.[36]

The *Lykes* decision clearly requires that the Board's determination of excessive profits be given no presumption of validity in a redetermination proceeding in this court. The testimony of Mr. Cravens strongly suggests that such an impermissible presumption insinuated itself into his excessive profit recommendation.

Column C, which summarizes Mr. Cravens' ultimate conclusion that plaintiff realized excess profits in the amount of $378,000, is a composite of columns A and B. Mr. Cravens explained that he derived column C by adding 75 percent of the so-called "maximum profit rate"

---

**36.** "Q. So, * * * [column B] represents approximately what the Renegotiation Board gave and then this column was a result of the Justice Department's asking you to find out if what the Renegotiation Board gave as a proper—a reasonable profit was a ballpark figure, is that correct?

"A. *Yes,* and that would be assuming the maximum value for the performance, and each element of input and each item below the line * * *." [Emphasis added.]

of column B to 25 percent of column A, the "average profit rate." This computation had the effect of weighting column B three times as heavily as column A and was designed by Mr. Cravens to correspond to the ratio of the dollar amount of plaintiff's guaranteed sales during 1966 to the dollar amount by which actual sales exceeded the total amount of monthly guarantees.

Column C, as a composite of columns A and B, is subject to the infirmities of the data from which it was derived. Column C, which provided the basis for Mr. Cravens' conclusion that plaintiff owes the United States $378,000 in excessive profits, is merely a weighted average of two other unsubstantiated profit recommendations.

This defect was not cured at trial by Mr. Cravens' explanation of the column C figures, upon which he based the remainder of this testimony. For example, Mr. Cravens testified that the $59,130 which he recommended as profit to reward plaintiff's performance under contract NAS 8–15476 represented a return of 2.1 percent on plaintiff's total costs in performing the contract and exceeded the weighted guidelines maximum of 2 percent. Apart from his earlier general statement that the weighted guidelines method would not provide an equitable means for establishing a rate of profit for plaintiff unless the actual weightings of ASPR 3–808.4 were abandoned in favor of higher percentages, defendant's witness failed to explain why he chose a figure in excess of the weighted guidelines percentage or why, for that matter, he did not regard a *higher* profit to be warranted by the contractor's performance.

Another example is Mr. Cravens' allocation of a 9.7 percent profit to plaintiff's general and administrative expenses, a percentage which exceeded the maximum gate of 8 percent provided in the weighted guidelines ASPR. The witness testified that the higher profit allowance was necessary in order to rec-ognize the performance of plaintiff's officers in insuring that the air transportation services met the NASA schedule, maintaining plaintiff's cash flow, and supervising activities of the relatively new corporation. He did not explain what type of corporate performance the weighted guidelines contemplated as necessary to justify the 8 percent maximum, or why plaintiff's performance justified a more liberal profit award.

The Government witness' recommendation of a profit amount to be assigned under his adjusted weighted guidelines technique to plaintiff's depreciation expense is another significant example of an inadequately explained profit recommendation. Depreciation is the element of cost for which Mr. Cravens felt the greatest deviation from the weighted guidelines was justified. The witness assigned a 20.8 percent profit to plaintiff's depreciation expense, almost three times the weighted guidelines amount. He explained his rationale for doing so as follows:

* * * Since we were looking at [the contractor] in hindsight, and since Internal Revenue in hindsight had changed depreciation methods, I wanted to reinstall the amount of money, or a certain amount of it, that had been taken away by Internal Revenue [in] going from four years to five years [as the depreciable life of the Super Guppy and Pregnant Guppy for tax purposes].

I put that back in here by giving a high rate for depreciation. * * *

The Internal Revenue Service action to which Mr. Cravens referred was based upon the Service's judgment that a 5-year depreciable life was more realistic than the 4-year life originally chosen by the plaintiff. Neither party has questioned this I.R.S. decision. In fact, the record shows that the $663,280 in "current year [tax] depreciation expense," listed in plaintiff's revised table of physical assets,[37] already reflects the $152,467

37. The table is included in the accounting submission to which the parties stipulated before trial.

I.R.S. disallowance of tax depreciation expense for 1966 based upon the change in depreciable life of the Guppy aircraft.

 Mr. Cravens did not explain why he chose, in effect, to modify the I.R.S. decision to disallow part of plaintiff's tax depreciation. As noted, *supra,* this court will exercise its discretion to redefine costs taken for tax purposes only to correct material misstatement of a contractor's cost of doing renegotiable business. No clear showing of such misstatement is present here.

By treating $316,257 as the correct amount of plaintiff's depreciation, the Government witness made an additional error. The $316,257 figure was obtained by subtracting $152,467, the full amount of the *tax* depreciation disallowed for 1966, from $468,724, plaintiff's book depreciation. Plaintiff's accounting submission, to which the parties stipulated, placed plaintiff's 1966 tax depreciation expense at $663,280. As noted, *supra,* this figure had already taken into account the I.R.S. depreciation disallowance, in which plaintiff concurred. Therefore, the depreciation amount relevant for renegotiation purposes is $663,-280, not the materially smaller and factually incorrect $316,257 used by defendant's witness. Nowhere in his testimony did defendant's witness acknowledge the distinction between *tax* deductions, which are relevant for renegotiation purposes, and *book* depreciation, which generally is not.

A further, serious discrepancy in Mr. Cravens' treatment of plaintiff's depreciation expense arose from his apparent failure to appreciate the distinction between tax and book depreciation. Plaintiff's 1966 tax depreciation of $663,280 exceeds its book depreciation of $468,724 by nearly $200,000.[38] To reflect the difference in amount between plaintiff's allowable tax depreciation and its book depreciation, the standard form contrac-

tor's report for renegotiation, which plaintiff was required to submit to the Board,[39] included an entry labeled "Adjustment from Books to Tax Basis." This adjustment was comprised almost exclusively by the difference between plaintiff's tax and book depreciation.

As noted, *supra,* tax rather than book depreciation is relevant for renegotiation purposes, absent special circumstances not present in this case. Accordingly, the $663,280 depreciation figure is the relevant one, not the $316,257 the Government witness erroneously regarded as the correct amount of plaintiff's depreciation expense. Perhaps as the result of this error, the witness assigned 20.8 percent profit to the $316,257 amount, while allowing only 7.4 percent profit on plaintiff's "Adjustment from Books to Tax Basis." As noted above, the adjustment *must* be added to the correct amount of plaintiff's book depreciation in order properly to state the amount of plaintiff's tax depreciation.

Defendant did not challenge the correctness of the tax depreciation amount accepted by the I.R.S. Therefore, it is reasonable to expect that, absent some explanation not present in the testimony of defendant's witness, the same profit percentage should be applied to both the depreciation figure listed under plaintiff's "direct operating expenses,"[40] and the correct "Adjustment from Book to Tax Basis," both of which are indispensable elements of the proper tax depreciation total.

Mr. Cravens' testimony, which recommended two highly disparate profit rates for the two elements of the same tax depreciation total, gave no indication that the witness was aware of this anomaly in his reasoning.

A further circumstance which seriously undermines confidence in Mr. Cravens' explanation of his column C results is

---

38. Before adjustment by the I.R.S. of plaintiff's tax depreciation to take account of the extension of the depreciable life of plaintiff's aircraft, this difference was approximately $330,-000.

39. This form was introduced into evidence as part of plaintiff's accounting submission.

40. This figure should be increased by $152,467 to $468,724, as explained *supra.*

that the "exceptional contribution" item in that column contains an $81,280 arithmetic mistake. Column C–1 is in effect a worksheet which shows how the composite figures of column C were derived. For every element of columns A and B, except "exceptional contribution," computations were carried out according to the 75 percent-25 percent formula. Without any explanation, Mr. Cravens failed to make a similar computation for "exceptional contribution." Taking this into consideration, the correct figure which should appear as the next to last entry in column C is $220,440. This is $81,280 more than the $139,160 which actually appears. Making this correction results in diminishing the final recommended refund from $378,000 to $296,720 (before adjustment for taxes) and increasing defendant's recommended profit to $836,140 or 29.93 percent of cost.

Despite this significant error, at trial Mr. Cravens presented the column C "reasonable profit" figures as the foundation for his ultimate profit conclusion. He treated his $378,000 excessive profit recommendation as completely valid notwithstanding the $81,280 arithmetic error. Even if Mr. Cravens' explanation of how he developed his column C figures had been persuasive, the $81,280 correction would need to be made.

Defendant's witness developed profit amounts to be awarded under each of the statutory factors for renegotiation by reshuffling the profit amounts in column C of his adjusted weighted guidelines table.

For example, profit amounts from Table I which Mr. Cravens felt could be assigned as components of the profit which he felt should be awarded for the contractor's efficiency included:

1. $59,130 recommended by Mr. Cravens to reward the contractor's "performance" under the weighted guidelines;

2. $62,800 to reward the contractor's "direct labor" activities; and

3. $48,710 as a profit increment on plaintiff's general and administrative expenses.

Mr. Cravens' total recommended award for plaintiff's efficiency was $170,640.

To derive a recommended profit attributable to the reasonableness of the contractor's costs and profits. Mr. Cravens assigned $136,640, which appeared in Table I as one-half the profit the witness felt should be awarded to recognize the contractor's risk in performing the NASA contract.

The $66,250 ascribed as profit to net worth and source of capital employed by the contractor was an aggregate of:

1. $32,900, or one-half the profit assigned under the adjusted weighted guidelines to plaintiff's depreciation cost;

2. $8,920 assigned as profit to plaintiff's insurance expense; and

3. $24,430 assigned as profit to plaintiff's "adjustment from book to tax basis" reflected on its accounting statement for renegotiation.

The witness assigned $169,540 profit to the risk assumed by the contractor. He compiled this figure by adding $136,640, the other half of the profit he had allocated to plaintiff's risk in his adjusted weighted guidelines table, to $32,900, the other half of the weighted guidelines amount he had assigned as profit to plaintiff's depreciation cost.

To recognize plaintiff's contribution to the space effort (defense effort), Mr. Cravens allowed $139,160, the *incorrect* column C figure he had assigned to plaintiff's "exceptional contribution" under the weighted guidelines.

The $72,680 assigned by the Government witness to recognize the *character of plaintiff's business* was simply an amalgam of weighted guidelines profit amounts Mr. Cravens had not used elsewhere. These included:

1. $1,320 assigned as profit on plaintiff's materials costs;

2. $12,390 allowed on plaintiff's fuel and oil expenses;

3. $58,000 assigned to plaintiff's "other" expenses; and

4. $970 profit on plaintiff's engineering and training expenses.

These figures totaled $754,940, the total profit recommended by Mr. Cravens.

As noted previously, the effect of this manifestly artificial technique was simply to reassign profit amounts derived pursuant to Mr. Cravens' modified version of the weighted guidelines to the statutory factors enumerated in the Renegotiation Act. However, because his profit recommendations were derived in such a roundabout manner, the witness did not justify his recommendations by explicit reference to the statutory factors *as set out in the Renegotiation Act.*

To sum up, the Government's witness' testimony indicated defendant's own lack of confidence in the applicability of the unmodified weighted guidelines procurement device to the renegotiation case under consideration. This lack of confidence, combined with the wholly inadequate explanation given by defendant's expert of the profit percentages he recommended instead of the weighted guidelines profit levels, left the court with insufficient information upon which to base a *reasoned* evaluation of the reasonableness of plaintiff's profits. The court simply cannot state with any degree of certainty if plaintiff's profits were excessive and, if they were, by how much. Accordingly, defendant has not met its burden of persuasion on either of these issues.

If a procurement officer were to use only the maximum figures recommended in the weighted guidelines ASPR, he would have recommended a profit of $542,321.50 for plaintiff. The $754,940 profit figure recommended by defendant's witness is 132 percent of the weighted guidelines maximum. The correct figure, $836,240, which eliminates defendant's arithmetic error, is 146 percent of the weighted guidelines maximum. The $1,132,940 profit actually realized by plaintiff is 197 percent of the weighted guidelines maximum. The testimony of defendant's witness, taken as a whole, failed to establish with any degree of assurance that his recommended profit allowance midway between the weighted guidelines maximum and the profit actually received by plaintiff was any more than a compromise solution.

As stated in *Bethlehem Steel Corp. v. United States,* 423 F.2d 300, 307, 191 Ct.Cl. 141, 154 (1970), it would be improper for the court to make a determination under the weighted guidelines—or any variation on them—when the record is inadequate. "To use the method one needs to be well informed." This is no less true now than it was then. If a de novo redetermination of excessive profits in the Court of Claims is to have meaning, the court must have enough information at its disposal to render a confident decision. The court must be the ultimate fact finder in the case, and no witness can relieve the court of its obligation. The testimony of witnesses must provide the court with the information it needs to render a just decision. As is correctly explained in *McCormick's* text on evidence—

* * * [t]he purpose of the testimony has had an effect on the degree of concreteness required. In the outer circle of collateral facts, near the rim of relevancy, evidence in general terms will be received with relative freedom, but as we come closer to the hub of the issue, the courts have been more careful to call for details instead of inferences. * * *

\* \* \* \* \* \*

Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided or as to the amount of unliquidated damages which should be given. It is believed all courts would exclude such extreme expressions. There is no necessity for this kind of evidence; to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witnesses * * *.

C. McCormick, Evidence § 12, at 26 (2d ed. 1972).

While the preceding discussion is couched in terms of admissibility, it is

relevant also to the amount of weight the court may give to testimony while preserving its own function to hear and decide.

Accordingly, defendant has failed to provide the court with evidence sufficient to enable it to determine what portion, if any, of plaintiff's profits realized during 1966 was excessive.

After careful consideration of all the facts, the statutory factors, and the submissions of the parties, it is concluded that defendant has failed to sustain its burden of proving that plaintiff has realized excessive profits and of showing the amount of such excess. While it is not altogether clear from the record, it does appear that plaintiff has paid the amount of the excessive profits as determined by the board to defendant. Therefore, plaintiff is entitled to a refund of the amount paid with interest as provided by the Renegotiation Act of 1951, *as amended.*

### CONCLUSION OF LAW

Upon the findings of fact which are made a part of the judgment herein, the court concludes and determines as a matter of law that defendant has failed to sustain its burden of proving that plaintiff has realized excessive profits and of showing the amount of such excess, and it is accordingly ordered that plaintiff is entitled to a refund of the amount paid to defendant, together with interest as provided by the Renegotiation Act of 1951, *as amended.*